## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RICK BELL, KAREN BELL,
BRIAN BELL, and BRANDEN BELL,

     Plaintiffs,

vs.                         CASE NO:

JASON POLLOCK, BOOM CONTENT, LLC,
GRAVITAS VENTURES, LLC. and RED
ARROW STUDIOS INTERNATIONAL, INC.,

     Defendants.

_____/

## <u>COMPLAINT</u>

Plaintiffs Richard Bell ("Rick"), Karen Bell ("Karen"), Brian Bell ("Brian"), and Branden Bell ("Branden") (collectively referred to as the "Bells"), by and through their undersigned counsel, hereby file this Complaint against Defendants Jason Pollock; Boom Content, LLC ("Boom Content"); Gravitas Ventures, LLC ("Gravitas Ventures"); and Red Arrow Studios ("Red Arrow Studios") (collectively referred to as the "Defendants"), and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     At all material times hereto, Rick was a citizen over the age of 18 and is a resident domiciled in Putnam County, Florida.

2.      Rick is a private citizen and has not sought any form of publicity, public note, or prominence outside of his own business affairs and private transactions.

3.      At all material times hereto, Karen was a citizen over the age of 18 and is a resident domiciled in Putnam County, Florida.

4.      Karen is a private citizen and has not sought any form of publicity, public note, or prominence outside of her own business affairs and private transactions.

5.      At all material times hereto, Brian was a citizen over the age of 18 and is a resident domiciled in Hillsborough County, Florida.

6.      Brian is a private citizen and has not sought any form of publicity, public note, or prominence outside of his own business affairs and private transactions.

7.      At all material times hereto, Branden was a citizen over the age of 18 and is a resident domiciled in Okaloosa County, Florida.

8.      Branden is a private citizen and has not sought any form of publicity, public note, or prominence outside of his own business affairs and private transactions.

9.      At all material times hereto, Defendant Jason Pollock was a citizen over the age of 18 and is a resident domiciled in Los Angeles County, California.

10.     This Court has personal jurisdiction over Jason Pollock. Jason Pollock satisfies Florida's long-arm statute, Florida Statute § 48.193 *et seq*. because he has committed tortious acts within this state expressly aimed at the Bells, the effects of which were suffered by the Bells in this district. Accordingly, Jason Pollock is carrying on general business activities in Florida and has sufficient contacts with Florida, thereby subjecting him to this Court's jurisdiction.

11.     At all material times hereto, Defendant Boom Content was a limited liability company organized under the laws of Delaware.

12.     Upon information and belief, at all material times hereto, Boom Content had one member: Philip Keezer, who is domiciled in the United Kingdom.

13.     This Court has personal jurisdiction over Boom Content pursuant to Florida's long-arm statute, Florida Statute § 48.193 *et seq*. Boom Content has committed tortious acts within this state expressly aimed at the Bells, the effects of which were suffered by the Bells in this district. Accordingly, Boom Content is carrying on general business activities in Florida and has sufficient contacts with Florida, thereby subjecting it to this Court's jurisdiction.

14.     At all material times hereto, Defendant, Gravitas Ventures was a foreign limited liability company organized under the laws of Delaware, with its principal place of business located at 2900 Detroit Avenue, 2nd Floor, Cleveland, Ohio 44113.

15.     At all material times hereto, Gravitas Ventures had two members: Red Arrow Studios International, Inc., located at 1209 Orange Street, Wilmington, Delaware 19801; and Gravitas Holdings, LP, located at 2900 Detroit Suite 2, Cleveland, Ohio 44113.

16.     At all material times, Gravitas Holdings, LP, had three members: Nolan A. Gallagher, who is domiciled in Cuyahoga County, Ohio; Brendan Gallagher, who is domiciled in Lorain County, Ohio; and Michael A. Murphy, who is domiciled in Cuyahoga County, Ohio.

17.     This Court has personal jurisdiction over Gravitas Ventures pursuant to Florida's long-arm statute, Florida Statute § 48.193 *et seq*. Gravitas Ventures has committed tortious acts within this state expressly aimed at the Bells, the effects of which were suffered by the Bells in this district. Accordingly, Gravitas Ventures is carrying on general business activities in Florida and has sufficient contact with Florida, thereby subjecting it to this Court's jurisdiction.

18.     At all material times hereto, Defendant Red Arrow Studios International, Inc. ("Red Arrow Studios"), was a foreign corporation organized under the laws of Delaware, with its principal place of business located at 39 W 19th Street, Floor 10, New York, New York 10011.

19.     This Court has personal jurisdiction over Red Arrow Studios, pursuant to Florida's long-arm statute, Florida Statute § 48.193 *et seq*. Red Arrow

Studios has committed tortious acts within this state expressly aimed at the Bells, the effects of which were suffered by the Bells in this district. Accordingly, Red Arrow Studios is carrying on general business activities in Florida and has sufficient contacts with the state, thereby subjecting it to this Court's jurisdiction.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest, and attorneys' fees and costs, and the parties have complete diversity.  The Bells are domiciled in Florida, and none of the Defendants are domiciled in Florida.

21.     All conditions precedent to the filing of this action have been performed.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to this action occurred within this Court's jurisdiction in Hillsborough County in the State of Florida.

## INTRODUCTION

23.     The Bells seek monetary damages for Defendants' publication of false and defamatory statements of and concerning Rick, Brian, and Branden, which have caused damage to their reputations, falsely imputed criminal conduct to them, subjected them to hatred, and endangered their safety.

24.     Defendants published false and defamatory statements about Rick, Brian, and Branden intentionally, or at least with reckless disregard as to the falsity of the statements, in a documentary film released in July 2021.

25.     Defendants also misappropriated the images, names, and likenesses of Karen, Rick, Brian, and Branden without their consent for use in the Documentary, which was distributed to online streaming platforms and paying viewers worldwide, including throughout the State of Florida where the Bells reside.

26.     The Bells have suffered damages due to Defendants' actions, including harm to their reputations and threats to their safety.

## GENERAL ALLEGATIONS

27.     On July 30, 2021, the documentary film *Finding Kendrick Johnson* (the "Documentary Film") was first released, and by December 27, 2021, it was available for internet users to stream on multiple online platforms.

28.     The Documentary was directed by Jason Pollock, produced by Boom Content, and distributed by Gravitas Ventures and Red Arrow Studios. Since its release, the Documentary has been streamed and viewed thousands of times, including in the State of Florida, where the Bells reside.

29.     The Documentary purports to tell the story of the murder of Kendrick Johnson (the "Decedent"), a Lowndes County High School student whose body was discovered in a rolled-up gym mat in the high school's gym in January 2013.

30.     Defendants maliciously exploited the mysterious death of the Decedent and the imagery and controversy surrounding the Decedent's death to fabricate a wholly false narrative and profit financially by painting the Bells as modern-day versions of those responsible for one of America's most brutal and infamous hate crimes.

31.     The Documentary Film represents that the Decedent's death was a murder.

32.     The Documentary Film further portrays that the murder was the result of criminal acts committed by Brian and Branden, two other Lowndes County High School students who it represents had "problems" with the Decedent around the time of his death.

33.     Defendants present the central thesis of the film, which is that the Decedent's murder was a second iteration of the horrific, racially motivated murder of Emmett Till.

34.     To that end, the Defendants' Documentary Film creates a false narrative, wherein Brian and Branden are presented as the modern-day stand-ins for the murderers of Emmett Till, Roy Bryant and his half-brother J.W. Milam.

35.     In furtherance of this false narrative, Defendants emphasize the similarity between the barbaric murder of Emmett Till by comparing the graphic images of the body of Emmett Till after his brutal murder with the images of the Decedent, which share visual similarities.

36.     Defendants omit from the Documentary Film that the images of the Decedent that are paralleled with Emmett Till were taken following an invasive autopsy, creating a false equivalency and supporting the false claim of the Documentary Film that the Decedent was brutally bludgeoned to death.[1]

37.     The Documentary Film goes even further to represent that Brian and Branden reenacted the murder of Emmett Till by creating the false narrative that Brian and Branden murdered the Decedent because of the Decedent's relationship with a Caucasian female, creating a false parallel between Brian and Branden's alleged motivations and the motivations of Emmett Till's killers involving the interaction between Emmett Till and Carolyn Bryant.

38.     Specifically, the Documentary Film represents that a fight between Brian and the Decedent and rumors of the Decedent's romantic involvement with Brian's girlfriend created "problems" between the Bells and the Decedent that eventually led to the Decedent's murder.

---

[1] In reality, the swelling of the Decedent's face, unlike that of Emmett Till, resulted from a procedure during an autopsy that requires peeling back the facial skin of the deceased, resulting in deformities that share visual similarities with a death caused by blunt force trauma to the head.

39.     Moreover, the Documentary propagates a conspiracy theory that the Decedent's death was improperly ruled an accident, and it claims that Rick, the father of Brian and Branden, who worked as an FBI agent, engaged in a cover up operation to conceal his sons' involvement in the Decedent's murder.

40.     The Documentary Film further states that Rick met with and intimidated potential witnesses.

41.      The Documentary Film also represents that Rick exploited his FBI connections to take the focus of the investigation off his sons to conceal their involvement in the Decedent's murder.

42.     Again, a false parallel between the Decedent's murder and the murder of Emmett Till is drawn wherein the murderers are found not guilty based on racial animus and a breakdown in the legal system.

43.     The Documentary Film also falsely maintains that Rick was forced to resign from his position after the Department of Justice discovered evidence of his "corruption" in relation to the investigation.

44.     The claim published in the Documentary Film that Brian, with the assistance of Branden, played a role in the Decedent's death is obviously false to anyone who has conducted any inquiry into the facts surrounding the Decedent's unfortunate and mysterious death.

45.     On January 14, 2013, the Georgia Bureau of Investigation conducted an autopsy of the Decedent's body, which determined that the cause of the Decedent's death was positional asphyxia and concluded that the manner of death was accidental.

46.     The prevailing theory as to the Decedent's cause of death was that it occurred after the Decedent attempted to retrieve his shoes, which were stored at the bottom of one of several vertically positioned gym mats in the corner of the gym. It is believed that the Decedent climbed on top of the gym mats, reached into the center of the mat in which his shoes were stored, lost his balance, and slid into the mat's opening, at which point he was unable to free himself and suffocated.

47.     Though it is virtually impossible that the Decedent was murdered by being bludgeoned to death in the middle of a high school during a school day with no witnesses, no blood spatter, no surveillance footage, and a high school filled with students capable of keeping the murder a secret, there is no question that Brian and Branden were not involved in the Decedent's death.

48.     Of paramount significance is the fact that Brian and Branden were nowhere near the Decedent at the time of his death, which is known to have occurred between 1:30 p.m. and 3:30 p.m., based on school surveillance footage and a report by the Lowndes County Sheriff's Office.

49.     Brian was in class at the pivotal time during which the Decedent's death occurred, and he was recorded by school surveillance footage walking into his class and not leaving the class on the opposite end of the Lowndes County High School campus.

50.     Further, Brian did not enter the school gym on the day of the Decedent's death, which was also verified by witnesses and video surveillance footage.

51.     Similarly, at the time of the Decedent's death, Branden was not even at Lowndes County High School.

52.     At the time of the Decedent's death, Branden was on a school bus traveling to a wrestling match in Macon, Georgia. The bus departed at around 12:30 p.m. on January 10, 2013, approximately one hour before the Decedent was last seen alive at 1:27 p.m., and arrived in Macon, Georgia just before 4:00 p.m. The departure and arrival times of the bus have been confirmed by the sworn testimony of individuals who traveled with Branden on the bus, by cell phone tower data, by the motel check-in time, and by data from the wrestler weigh-in at the match at which Branden participated.

53.     Although Brian and Branden had been eliminated as suspects for years at the time the Documentary Film was published, the Documentary Film presents still images from the school surveillance footage wherein Brian can be

seen in the same still surveillance image as the Decedent in a hallway, as though this still surveillance image was newly uncovered "smoking gun" evidence of Brian's involvement in the murder.

54.     In fact, the film's narration states that this still image gave the narrator "chills" as though the murder mystery had been solved and Brian was the culprit because he had stated that he did not see the Decedent on the day of his passing.

55.     The surveillance images were not newly discovered and were reviewed by several investigative agencies. They were not images of Brian interacting with the Decedent, they were not near in time to the Decedent's location of death, and they were not near in proximity to the location of the Decedent's death.

56.     All of the above information was widely known and publicly available information for years before the publication of the Documentary Film in July 2021.

57.     Worse, all this exculpatory evidence, which eliminates any possibility that the Bells were involved in the Decedent's death, let alone murder, and which Defendants knew or should have known, is completely omitted from the Documentary Film.

58.     The Documentary Film's claims that Rick was involved in obstructing justice, tampering with witnesses, tampering with evidence, and covering up his

sons' participation in a violent bludgeoning murder of the Decedent, as well as the statement that evidence of Rick's corruption prompted the FBI to force him to resign are also false.

59.   In December 2014, the FBI produced a letter detailing its investigation, unequivocally stating there was no coverup or conspiracy.

60.   Additionally, a report released by the Lowndes County Sheriff's Office in January 2022 declared that "any person who looks at this case objectively would know that it would be impossible to conceal any evidence due to the involvement of so many agencies and investigators."

61.   It is also easily verifiable that the FBI did not force Rick to resign from his position.

62.   Rick retired on December 31, 2016, with full benefits.

63.   This information, which Defendants knew or should have known, is also completely excluded from the Documentary Film.

64.   The January 2022 Lowndes County Sheriff's Office report, which was based on evidence available as far back as 2014, also stated that such evidence "does not produce anything to prove any criminal act by anyone that would have resulted in the death" of the Decedent.

65.   Even though Defendants knew or should have known that the evidence did not establish that either Brian and Branden were involved in the

Decedent's death and that Rick did not facilitate a subsequent coverup, Defendants conveyed this blatantly false information in the Documentary Film in the most harmful fashion possible to the Bells to persuade the audience that the Bells were murderers involved in a gruesome racially-motivated murder akin to the murder of Emmett Till.

66.    The Documentary Film also misappropriates the names, images, and likenesses of Rick, Karen, Brian, and Branden throughout its entire duration.

67.    None of the Bells consented to Defendants' use of their names, images, or likenesses, and such use is not otherwise authorized by law.

68.    Since the release of the Documentary Film, and because of its defamatory content, Rick, Karen, Brian, and Branden have all suffered harm to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

69.    The Bells have also been targets of hatred, threats, and false accusations. *See* **Composite Exhibit A**.

70.    Brian and Branden have also had extreme difficulty obtaining employment due to the toxic and harmful misrepresentations the Documentary Film has published throughout the State of Florida, which has rendered them nothing short of radioactive for prospective employers.

71.     The Bells have even had former friends and family members disassociate from them due to the Bells' toxicity, danger, and public discourse that the Documentary Film has caused.

## COUNT I – DEFAMATION AGAINST JASON POLLOCK

72.     The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

73.     This is an action against Jason Pollock for defamation.

74.     Jason Pollock took part in the publication of the Documentary Film.

75.     The Documentary Film contains multiple statements by interviewees and the narrator that indicate Brian and Branden were involved in the Decedent's murder, including, but not limited to, the following:

   a.   A statement by retired homicide detective Mitch Credle that there was something not "right" about the way the case was handled because "the two persons listed as persons of interest" were the sons of an FBI agent and one of the sons was a "star athlete";

   b.   A statement by the narrator that, "as the investigation heated up and students began to be subpoenaed, the story of [the Decedent] and the Bell brothers started

circulating the community," and "there had definitely been some problems";

c. A statement by the Decedent's friend that Brian was upset that the Decedent "got the best" of him during a physical altercation between the Decedent and Brian;

d. A statement by the Decedent's father that the Decedent said Branden had been staring at him and "telling people at school that it's not over" with respect to the fight between the Decedent and Brian;

e. A statement by the Decedent's father that Rick approached the Decedent at school and told the Decedent that the fight between the Decedent and Brian was unfair and that the Decedent should come to the Bells' house and re-fight Brian;

f. A statement by the Decedent's friend that after the Decedent's death, Brian "started acting funny" because he had changed the routes he took to his classes and began avoiding the Decedent's friends;

g. An excerpted news clip indicating that there was a conflict between Brian and the Decedent over the

Decedent's alleged involvement with Brian's girlfriend, which motivated Brian to murder the Decedent;

h.  Statements by the Decedent's father that at the time of the Decedent's death, the Decedent didn't "have beef with nobody else," was not "into it with nobody else," and that the Bells "were the only ones" with whom the Decedent had conflicts;

i.  A statement by the Decedent's father that after the Decedent's death, the Bells were "the only ones that didn't get interviewed," and "didn't get questioned," and were "the only ones at the time who lawyered up";

j.  Statements by the Decedent's aunt that the "coverup" of the Decedent's death began with "one of their own GBI agents and his children," that "trickled down to the medical examiner" and the funeral home, and that all the individuals involved were going to great lengths "just to cover for these children";

k.  A rhetorical question by a producer off-screen that indicated seven judges would not have recused

themselves if "an FBI agent's children" had not been responsible for the Decedent's death; and

l. A statement by the narrator, referring to Brian, that "seeing the alleged killer of KJ standing next to him in the hallway the day he died in school has sent chills down our spines."

76. The Documentary also contains multiple statements by interviewees and the narrator that indicate that Rick covered up the Decedent's murder because his sons were involved in it, that he abused his connections at the FBI, and that he committed obstruction of justice, including, but not limited to, the following:

a. A statement by the Decedent's aunt that individuals attempting to come forward with the truth were "going to jail" and "being threatened";

b. A statement by the Decedent's mother that Michael Moore, the attorney who oversaw the investigation of the Decedent's death was "scared" out of his job by the Bells;

c. A statement by Mitch Credle that Rick met with, followed, and intimidated witnesses in the case and "interfere[d] with a grand jury investigation";

d.  A statement by Mitch Credle that he and other former investigators in the case "thought they got to the point where either [they] were going to make an arrest of [Rick], or he may have been getting indicted";

e.  A statement by Mitch Credle that after the case was dismissed, he "really thought they must have struck a deal with Rick Bell";

f.  Statements by the Decedent's father that the Department of Justice had evidence of Rick's corruption, which they were planning to turn over to the FBI, and that Rick was subsequently forced to resign from his job with the FBI; and

g.  A statement by Mitch Credle that if the investigation would have continued, he "felt as though" Rick would have been arrested for obstruction of justice.

77.    It is false that "problems," such as the fight or the Decedent's alleged relationship with Brian's girlfriend, catalyzed any involvement by Brian or Branden in the Decedent's death.

78.     It is also false that the Brian and Branden did not get questioned or interviewed by law enforcement and that this purported absence of questioning and interviewing indicates they were involved in the Decedent's death.

79.     Moreover, it is false that the investigating agencies, such as the FBI, were covering up for Brian and Branden because the brothers were involved in the Decedent's death.

80.     Additionally, it is untrue that seven judges recused themselves because Brian and Branden, the sons of an FBI agent, were involved in the Decedent's death.

81.     It is false that the Bells intimidated Michael Moore into leaving his position as U.S. Attorney for the Middle District of Georgia.

82.     Similarly, it is a misrepresentation that Brian is the "alleged killer" of the Decedent. In reality, at the time the Documentary was produced, Brian was not a suspect of any investigation. He was eliminated as a potential suspect, and it is not even the position of any investigating body that the Decedent was actually murdered.

83.     Further, it is false that individuals with information about the Decedent's death were being threatened or going to jail, and it is false that Rick met with, followed, and intimidated witnesses in the case.

84.     Finally, it is untrue that Rick engaged in obstruction of justice, impeded the investigation of the Decedent's death, or was forced to resign because evidence of his corruption was uncovered. Rick retired from the FBI by choice in December 2016 with full benefits.

85.     The Documentary conveys false information and misrepresentations to persuade the audience, based on such false representations, that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent.

86.     It also puts forth false, unsupported, and erroneous information to create the false narrative that Rick used his influence and connections as an FBI agent as well as intimidation tactics to obstruct justice and orchestrate a coverup of his sons' involvement in the Decedent's death.

87.     The Documentary's defamatory statements concerning Brian and Branden imputed to them the criminal conduct of committing murder, brought them into ill repute, and undermined their integrity in every conceivable manner.

88.     The Documentary's defamatory statements concerning Rick represent that he is guilty of committing the criminal offense of obstruction of justice, witness tampering, destruction of evidence, and abuse of process, which not only brought him into ill repute and undermined his integrity, but also

imputed to him conduct and characteristics that are incompatible with his position as an FBI agent.

89.    Jason Pollock published the Documentary, which contained these false and defamatory statements against Rick, Brian, and Branden, even though he knew, or should have known, based on the copious availability of sufficient evidence showing as much, that such statements were false.

90.    In publishing the Documentary, Jason Pollock failed to include known facts that would exculpate the Bells and omitted pertinent information to persuade the audience of the Documentary Film of the false impression that Brian and Branden murdered the Decedent and that Rick helped cover it up.

91.    Jason Pollock intentionally omitted virtually all of the material facts that resulted in the clearing of the Bells which include, but are not limited to, the following: that video surveillance confirmed that Brian did not enter the Lowndes County High School gym on the day of the Decedent's death, that Branden was on the way to a wrestling match in Macon, Georgia that the timing of the Decedent's death clearly demonstrates that Brian and Branden were not anywhere near the Decedent's location when he died or was killed, all based upon actual surveillance footage, and that the FBI reported in 2014 that it was certain no coverup or conspiracy occurred.

92.     Jason Pollock was aware of the animosity that existed between the interviewees featured in the Documentary and the Bells. For instance, the Documentary contained statements by the Decedent's friends and family, who had been hostile toward the Bell family since rumors of the Bells' alleged involvement in the Decedent's death had begun circulating. Despite this knowledge, Jason Pollock included these statements, unchecked and uncontradicted, and offered no disclaimers about these biases.

93.     Moreover, Jason Pollock emphasized insignificant events, such as the fight and the purported conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, to support the defamatory misrepresentation that Brian murdered the Decedent.

94.     In reality, there was no involvement between the Decedent and Brian's girlfriend, and the relationship between Brian and the Decedent was not a feud as described by the Documentary Film.

95.     Finally, prior the Documentary's publication, Jason Pollock was aware that investigative agencies, including the Lowndes County Sheriff's Office, the Georgia Bureau of Investigation, and the Department of Justice, failed to take any action against the Bells. Notwithstanding that multiple investigative agencies chose not to prosecute any of the Bells for any crime all with their own independent investigations of the matter, Jason Pollock published the

Documentary, which presents Brian and Branden as murderers and Rick Bell as using his position in the FBI to conceal the involvement of his sons in the murder.

96.    Jason Pollock's publication of the debunked theory that Brian and Branden murdered the Decedent was reckless and ignored information that had been publicly available since 2014.

97.    Jason Pollock further made the defamatory impact of his publication worse by representing that the Documentary Film was based upon years of research.

98.    Jason Pollock relied upon altered clips of interviews that he himself did not create to convey a distorted perception to the audience that the Bells were involved in the Decedent's death.

99.    Jason Pollock relied upon investigative documentation from investigative agencies, which necessarily means that he had access to the information from those agencies that supported the agencies' conclusions that Brian and Branden were not involved in the death of the Decedent.  Jason Pollock failed to publish the exculpatory information in the reports in the Documentary Film.

100.   Jason Pollock relied upon unreliable sources of information that were known to be unreliable to support the film's thesis that Brian and Branden committed a murder akin to the Emmett Till murder, including fundamentally

misleading photographs, debunked blood spatter evidence known to have been related to a completely different episode involving none of the Bells or the Decedent, the statements of the grieving friends and family of the Decedent who have been discredited (one of whom has even been charged with fabricating false evidence to frame Brian), and information related to the execution of search warrant of the Bells' home, without explaining that the search warrant's execution yielded no evidence of criminal conduct.

101.   Jason Pollock also made repeated attacks against the Bells in the media in the advertising of the film. For example, the Documentary Film's narrator made public appearances, wherein she falsely stated that the Decedent was murdered by the Bells and that there was a great injustice.

102.   Jason Pollock failed to make any effort to contact what would be key witnesses in the event that he seriously considered the possibility that the Decedent was murdered, including the female that allegedly had a relationship with the Decedent that motivated Brian and Branden to murder the Decedent, Brian, Branden, Rick, Karen, the forensic analsists that concluded that the Decedent's death was accidental, the attorneys or witnesses referenced in the prior lawsuit filed by the Bells for defamation in relation to the Ebony Magazine story concerning the Decedent's death, the witnesses allegedly threatened by Rick, or

any of the investigative personnel that actually made determinations concerning whether any indictment should be issued.

103.   Jason Pollock proceeded to "strike while the iron was hot" with publication of this at-best reckless Documentary Film without observing any professional reporting standards for fully investigating all sides of a story, without any mechanisms in place to mitigate against such a defamatory publication, all to profit financially from public controversy and cultural salience of contemporary racial injustice.  In so doing, Jason Pollock ignored legitimate controversies that otherwise could have been explored and vilified completely innocent people in the tragic death of the Decedent.  Jason Pollock not only exploited the media landscape for his cash grab, but he also exploited the Decedent's family by adding fuel to the fire of a long-standing, but likely incorrect, belief that their son was murdered, and worse, that their son was murdered by Brian and Branden, who simply could not have murdered the Decedent.

104.   All of Jason Pollock's conduct was deliberately deceptive, exploitative, and fundamentally wrong, and by portraying the false narrative of a murder cover up in relation to an innately mysterious death involving a highly unusual death resulting from positional asphyxiation in a school gym mat, provided seriousness, gravitas, and renewed belief among those who viewed the

publication or its advertisement that the Bells were involved in the brutal murder of an innocent child.

105.   Jason Pollock proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

106.   Jason Pollock proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

107.   The actions of Jason Pollock were the direct and proximate cause of damages suffered by the Bells.

108.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

109.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

110.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the

possibility that they could be employing murderers involved in a racially motivated murder of a child.

111.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

112.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Jason Pollock for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT II – DEFAMATION AGAINST BOOM CONTENT

113.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

114.   This is an action against Boom Content for defamation.

115.   Boom Content took part in the publication of the Documentary Film.

116. The Documentary Film contains multiple statements by interviewees and the narrator that indicate Brian and Branden were involved in the Decedent's murder, including, but not limited to, the following:

    a. A statement by retired homicide detective Mitch Credle that there was something not "right" about the way the case was handled because "the two persons listed as persons of interest" were the sons of an FBI agent and one of the sons was a "star athlete";

    b. A statement by the narrator that, "as the investigation heated up and students began to be subpoenaed, the story of [the Decedent] and the Bell brothers started circulating the community," and "there had definitely been some problems";

    c. A statement by the Decedent's friend that Brian was upset that the Decedent "got the best" of him during a physical altercation between the Decedent and Brian;

    d. A statement by the Decedent's father that the Decedent said Branden had been staring at him and "telling people at school that it's not over" with respect to the fight between the Decedent and Brian;

e. A statement by the Decedent's father that Rick approached the Decedent at school and told the Decedent that the fight between the Decedent and Brian was unfair and that the Decedent should come to the Bells' house and re-fight Brian;

f. A statement by the Decedent's friend that after the Decedent's death, Brian "started acting funny" because he had changed the routes he took to his classes and began avoiding the Decedent's friends;

g. An excerpted news clip indicating that there was a conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, which motivated Brian to murder the Decedent;

h. Statements by the Decedent's father that at the time of the Decedent's death, the Decedent didn't "have beef with nobody else," was not "into it with nobody else," and that the Bells "were the only ones" with whom the Decedent had conflicts;

i. A statement by the Decedent's father that after the Decedent's death, the Bells were "the only ones that

didn't get interviewed," and "didn't get questioned,"
and were "the only ones at the time who lawyered up";

j.  Statements by the Decedent's aunt that the "coverup" of
the Decedent's death began with "one of their own GBI
agents and his children," that "trickled down to the
medical examiner" and the funeral home, and that all the
individuals involved were going to great lengths "just to
cover for these children";

k.  A rhetorical question by a producer off-screen that
indicated seven judges would not have recused
themselves if "an FBI agent's children" had not been
responsible for the Decedent's death; and

l.  A statement by the narrator, referring to Brian, that
"seeing the alleged killer of KJ standing next to him in
the hallway the day he died in school has sent chills
down our spines."

117.   The Documentary also contains multiple statements by interviewees
and the narrator that indicate that Rick covered up the Decedent's murder because
his sons were involved in it, that he abused his connections at the FBI, and that he
committed obstruction of justice, including, but not limited to, the following:

a. A statement by the Decedent's aunt that individuals attempting to come forward with the truth were "going to jail" and "being threatened";

b. A statement by the Decedent's mother that Michael Moore, the attorney who oversaw the investigation of the Decedent's death was "scared" out of his job by the Bells;

c. A statement by Mitch Credle that Rick met with, followed, and intimidated witnesses in the case and "interfere[d] with a grand jury investigation";

d. A statement by Mitch Credle that he and other former investigators in the case "thought they got to the point where either [they] were going to make an arrest of [Rick], or he may have been getting indicted";

e. A statement by Mitch Credle that after the case was dismissed, he "really thought they must have struck a deal with Rick Bell";

f. Statements by the Decedent's father that the Department of Justice had evidence of Rick's corruption, which they were planning to turn over to the FBI, and that Rick was

subsequently forced to resign from his job with the FBI; and

g.  A statement by Mitch Credle that if the investigation would have continued, he "felt as though" Rick would have been arrested for obstruction of justice.

118.   It is false that "problems," such as the fight or the Decedent's alleged relationship with Brian's girlfriend, catalyzed any involvement by Brian or Branden in the Decedent's death.

119.   It is also false that the Brian and Branden did not get questioned or interviewed by law enforcement and that this purported absence of questioning and interviewing indicates they were involved in the Decedent's death.

120.   Moreover, it is false that the investigating agencies, such as the FBI, were covering up for Brian and Branden because the brothers were involved in the Decedent's death.

121.   Additionally, it is untrue that seven judges recused themselves because Brian and Branden, the sons of an FBI agent, were involved in the Decedent's death.

122.   It is false that the Bells intimidated Michael Moore into leaving his position as U.S. Attorney for the Middle District of Georgia.

123.    Similarly, it is a misrepresentation that Brian is the "alleged killer" of the Decedent. In reality, at the time the Documentary was produced, Brian was not a suspect of any investigation. He was eliminated as a potential suspect, and it is not even the position of any investigating body that the Decedent was actually murdered.

124.    Further, it is false that individuals with information about the Decedent's death were being threatened or going to jail, and it is false that Rick met with, followed, and intimidated witnesses in the case.

125.    Finally, it is untrue that Rick engaged in obstruction of justice, impeded the investigation of the Decedent's death, or was forced to resign because evidence of his corruption was uncovered. Rick retired from the FBI by choice in December 2016 with full benefits.

126.    The Documentary conveys false information and misrepresentations to persuade the audience, based on such false representations, that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent.

127.    It also puts forth false, unsupported, and erroneous information to create the false narrative that Rick used his influence and connections as an FBI agent as well as intimidation tactics to obstruct justice and orchestrate a coverup of his sons' involvement in the Decedent's death.

128.   The Documentary's defamatory statements concerning Brian and Branden imputed to them the criminal conduct of committing murder, brought them into ill repute, and undermined their integrity in every conceivable manner.

129.   The Documentary's defamatory statements concerning Rick represent that he is guilty of committing the criminal offense of obstruction of justice, witness tampering, destruction of evidence, and abuse of process, which not only brought him into ill repute and undermined his integrity, but also imputed to him conduct and characteristics that are incompatible with his position as an FBI agent.

130.   Boom Content published the Documentary, which contained these false and defamatory statements against Rick, Brian, and Branden, even though he knew, or should have known, based on the copious availability of sufficient evidence showing as much, that such statements were false.

131.   In publishing the Documentary, Boom Content failed to include known facts that would exculpate the Bells and omitted pertinent information to persuade the audience of the Documentary Film of the false impression that Brian and Branden murdered the Decedent and that Rick helped cover it up.

132.   Boom Content intentionally omitted virtually all of the material facts that resulted in the clearing of the Bells which include, but are not limited to, the following: that video surveillance confirmed that Brian did not enter the Lowndes

County High School gym on the day of the Decedent's death, that Branden was on the way to a wrestling match in Macon, Georgia, that the timing of the Decedent's death clearly demonstrates that Brian and Branden were not anywhere near the Decedent's location when he died or was killed all based upon actual surveillance footage, and that the FBI reported in 2014 that it was certain no coverup or conspiracy occurred.

133.   Boom Content was aware of the animosity that existed between the interviewees featured in the Documentary and the Bells. For instance, the Documentary contained statements by the Decedent's friends and family, who had been hostile toward the Bell family since rumors of the Bells' alleged involvement in the Decedent's death had begun circulating. Despite this knowledge, Boom Content included these statements, unchecked and uncontradicted, and offered no disclaimers about these biases.

134.   Moreover, Boom Content emphasized insignificant events, such as the fight and the purported conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, to support the defamatory misrepresentation that Brian murdered the Decedent.

135.   In reality, there was no involvement between the Decedent and Brian's girlfriend, and the relationship between Brian and the Decedent was not a feud as described by the Documentary Film.

136.   Finally, prior the Documentary's publication, Boom Content was aware that investigative agencies, including the Lowndes County Sheriff's Office, the Georgia Bureau of Investigation, and the Department of Justice, failed to take any action against the Bells. Notwithstanding that multiple investigative agencies chose not to prosecute any of the Bells for any crime all with their own independent investigations of the matter, Boom Content published the Documentary, which presents Brian and Branden as murderers and Rick Bell as using his position in the FBI to conceal the involvement of his sons in the murder.

137.   Boom Content's publication of the debunked theory that Brian and Branden murdered the Decedent was reckless and ignored information that had been publicly available since 2014.

138.   Boom Content further made the defamatory impact of its publication worse by representing that the Documentary Film was based upon years of research.

139.   Boom Content relied upon altered clips of interviews that it did not create itself to convey a distorted perception to the audience that the Bells were involved in the Decedent's death.

140.   Boom Content relied upon investigative documentation from investigative agencies, which necessarily means that it had access to the information from those agencies that supported the agencies' conclusions that

Brian and Branden were not involved in the death of the Decedent. Boom Content failed to publish the exculpatory information in the reports in the Documentary Film.

141.    Boom Content relied upon unreliable sources of information that were known to be unreliable to support the film's thesis that Brian and Branden committed a murder akin to the Emmett Till murder, including fundamentally misleading photographs, debunked blood spatter evidence known to have been related to a completely different episode involving none of the Bells or the Decedent, the statements of the grieving friends and family of the Decedent who have been discredited (one of whom has even been charged with fabricating false evidence to frame Brian), and information related to the execution of search warrant of the Bells' home, without explaining that the search warrant's execution yielded no evidence of criminal conduct.

142.    Boom Content also made repeated attacks against the Bells in the media in the advertising of the film. For example, the Documentary Film's narrator made public appearances, wherein she falsely stated that the Decedent was murdered by the Bells and that there was a great injustice.

143.    Boom Content failed to make any effort to contact what would be key witnesses in the event that he seriously considered the possibility that the Decedent was murdered, including the female that allegedly had a relationship

with Decedent that motivated Brian and Branden to murder the Decedent, Brian, Branden, Rick, Karen, the forensic analysts that concluded that the Decedent's death was accidental, the attorneys or witnesses referenced in the prior lawsuit filed by the Bells for defamation in relation to the Ebony Magazine story concerning the Decedent's death, the witnesses allegedly threatened by Rick, or any of the investigative personnel that actually made determinations concerning whether any indictment should be issued.

144.   Boom Content proceeded to "strike while the iron was hot" with publication of this at-best reckless Documentary Film without observing any professional reporting standards for fully investigating all sides of a story, without any mechanisms in place to mitigate against such a defamatory publication, all to profit financially from public controversy and cultural salience of contemporary racial injustice.  In so doing, Boom Content ignored legitimate controversies that otherwise could have been explored and vilified completely innocent people in the tragic death of the Decedent.  Boom Content not only exploited the media landscape for his cash grab, but he also exploited the Decedent's family by adding fuel to the fire of a long-standing, but likely incorrect, belief that their son was murdered, and worse, that their son was murdered by Brian and Branden, who simply could not have murdered the Decedent.

145. All of Boom Content's conduct was deliberately deceptive, exploitative, and fundamentally wrong, and by portraying the false narrative of a murder cover up in relation to an innately mysterious death involving a highly unusual death resulting from positional asphyxiation in a school gym mat, provided seriousness, gravitas, and renewed belief among those who viewed the publication or its advertisement that the Bells were involved in the brutal murder of an innocent child.

146. Boom Content proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

147. Boom Content proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

148. The actions of Boom Content were the direct and proximate cause of damages suffered by the Bells.

149. The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

150.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

151.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

152.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

153.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Boom Content for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT III – DEFAMATION AGAINST GRAVITAS VENTURES

154.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

155.   This is an action against Gravitas Ventures for defamation.

156.   Gravitas Ventures took part in the publication of the Documentary Film.

157.   The Documentary Film contains multiple statements by interviewees and the narrator that indicate Brian and Branden were involved in the Decedent's murder, including, but not limited to, the following:

   a.   A statement by retired homicide detective Mitch Credle that there was something not "right" about the way the case was handled because "the two persons listed as persons of interest" were the sons of an FBI agent and one of the sons was a "star athlete";

   b.   A statement by the narrator that, "as the investigation heated up and students began to be subpoenaed, the story of [the Decedent] and the Bell brothers started circulating the community," and "there had definitely been some problems";

c.  A statement by the Decedent's friend that Brian was upset that the Decedent "got the best" of him during a physical altercation between the Decedent and Brian;

d.  A statement by the Decedent's father that the Decedent said Branden had been staring at him and "telling people at school that it's not over" with respect to the fight between the Decedent and Brian;

e.  A statement by the Decedent's father that Rick approached the Decedent at school and told the Decedent that the fight between the Decedent and Brian was unfair and that the Decedent should come to the Bells' house and re-fight Brian;

f.  A statement by the Decedent's friend that after the Decedent's death, Brian "started acting funny" because he had changed the routes he took to his classes and began avoiding the Decedent's friends;

g.  An excerpted news clip indicating that there was a conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, which motivated Brian to murder the Decedent;

h. Statements by the Decedent's father that at the time of the Decedent's death, the Decedent didn't "have beef with nobody else," was not "into it with nobody else," and that the Bells "were the only ones" with whom the Decedent had conflicts;

i. A statement by the Decedent's father that after the Decedent's death, the Bells were "the only ones that didn't get interviewed," and "didn't get questioned," and were "the only ones at the time who lawyered up";

j. Statements by the Decedent's aunt that the "coverup" of the Decedent's death began with "one of their own GBI agents and his children," that "trickled down to the medical examiner" and the funeral home, and that all the individuals involved were going to great lengths "just to cover for these children";

k. A rhetorical question by a producer off-screen that indicated seven judges would not have recused themselves if "an FBI agent's children" had not been responsible for the Decedent's death; and

l.  A statement by the narrator, referring to Brian, that "seeing the alleged killer of KJ standing next to him in the hallway the day he died in school has sent chills down our spines."

158.  The Documentary also contains multiple statements by interviewees and the narrator that indicate that Rick covered up the Decedent's murder because his sons were involved in it, that he abused his connections at the FBI, and that he committed obstruction of justice, including, but not limited to, the following:

a.  A statement by the Decedent's aunt that individuals attempting to come forward with the truth were "going to jail" and "being threatened";

b.  A statement by the Decedent's mother that Michael Moore, the attorney who oversaw the investigation of the Decedent's death was "scared" out of his job by the Bells;

c.  A statement by Mitch Credle that Rick met with, followed, and intimidated witnesses in the case and "interfere[d] with a grand jury investigation";

d.  A statement by Mitch Credle that he and other former investigators in the case "thought they got to the point

where either [they] were going to make an arrest of [Rick], or he may have been getting indicted";

e.  A statement by Mitch Credle that after the case was dismissed, he "really thought they must have struck a deal with Rick Bell";

f.  Statements by the Decedent's father that the Department of Justice had evidence of Rick's corruption, which they were planning to turn over to the FBI, and that Rick was subsequently forced to resign from his job with the FBI; and

g.  A statement by Mitch Credle that if the investigation would have continued, he "felt as though" Rick would have been arrested for obstruction of justice.

159.   It is false that "problems," such as the fight or the Decedent's alleged relationship with Brian's girlfriend, catalyzed any involvement by Brian or Branden in the Decedent's death.

160.   It is also false that the Brian and Branden did not get questioned or interviewed by law enforcement and that this purported absence of questioning and interviewing indicates they were involved in the Decedent's death.

161.   Moreover, it is false that the investigating agencies, such as the FBI, were covering up for Brian and Branden because the brothers were involved in the Decedent's death.

162.   Additionally, it is untrue that seven judges recused themselves because Brian and Branden, the sons of an FBI agent, were involved in the Decedent's death.

163.   It is false that the Bells intimidated Michael Moore into leaving his position as U.S. Attorney for the Middle District of Georgia.

164.   Similarly, it is a misrepresentation that Brian is the "alleged killer" of the Decedent. In reality, at the time the Documentary was produced, Brian was not a suspect of any investigation. He was eliminated as a potential suspect, and it is not even the position of any investigating body that the Decedent was actually murdered.

165.   Further, it is false that individuals with information about the Decedent's death were being threatened or going to jail, and it is false that Rick met with, followed, and intimidated witnesses in the case.

166.   Finally, it is untrue that Rick engaged in obstruction of justice, impeded the investigation of the Decedent's death, or was forced to resign because evidence of his corruption was uncovered. Rick retired from the FBI by choice in December 2016 with full benefits.

167.   The Documentary conveys false information and misrepresentations to persuade the audience, based on such false representations, that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent.

168.   It also puts forth false, unsupported, and erroneous information to create the false narrative that Rick used his influence and connections as an FBI agent as well as intimidation tactics to obstruct justice and orchestrate a coverup of his sons' involvement in the Decedent's death.

169.   The Documentary's defamatory statements concerning Brian and Branden imputed to them the criminal conduct of committing murder, brought them into ill repute, and undermined their integrity in every conceivable manner.

170.   The Documentary's defamatory statements concerning Rick represent that he is guilty of committing the criminal offense of obstruction of justice, witness tampering, destruction of evidence, and abuse of process, which not only brought him into ill repute and undermined his integrity, but also imputed to him conduct and characteristics that are incompatible with his position as an FBI agent.

171.   Gravitas Ventures published the Documentary, which contained these false and defamatory statements against Rick, Brian, and Branden, even

though he knew, or should have known, based on the copious availability of sufficient evidence showing as much, that such statements were false.

172.   In publishing the Documentary, Gravitas Ventures failed to include known facts that would exculpate the Bells and omitted pertinent information to persuade the audience of the Documentary Film of the false impression that Brian and Branden murdered the Decedent and that Rick helped cover it up.

173.   Gravitas Ventures intentionally omitted virtually all of the material facts that resulted in the clearing of the Bells which include, but are not limited to, the following: that video surveillance confirmed that Brian did not enter the Lowndes County High School gym on the day of the Decedent's death, that Branden was on the way to a wrestling match in Macon, Georgia that the timing of the Decedent's death clearly demonstrates that Brian and Branden were not anywhere near the Decedent's location when he died or was killed, all based upon actual surveillance footage, and that the FBI reported in 2014 that it was certain no coverup or conspiracy occurred.

174.   Gravitas Ventures was aware of the animosity that existed between the interviewees featured in the Documentary and the Bells. For instance, the Documentary contained statements by the Decedent's friends and family, who had been hostile toward the Bell family since rumors of the Bells' alleged involvement in the Decedent's death had begun circulating. Despite this

knowledge, Gravitas Ventures included these statements, unchecked and uncontradicted, and offered no disclaimers about these biases.

175.   Moreover, Gravitas Ventures emphasized insignificant events, such as the fight and the purported conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, to support the defamatory misrepresentation that Brian murdered the Decedent.

176.   In reality, there was no involvement between the Decedent and Brian's girlfriend, and the relationship between Brian and the Decedent was not a feud as described by the Documentary Film.

177.   Finally, prior the Documentary's publication, Gravitas Ventures was aware that investigative agencies, including the Lowndes County Sheriff's Office, the Georgia Bureau of Investigation, and the Department of Justice, failed to take any action against the Bells. Notwithstanding that multiple investigative agencies chose not to prosecute any of the Bells for any crime all with their own independent investigations of the matter, Gravitas Ventures published the Documentary, which presents Brian and Branden as murderers and Rick as using his position in the FBI to conceal the involvement of his sons in the murder.

178.   Gravitas Ventures' publication of the debunked theory that Brian and Branden murdered the Decedent was reckless and ignored information that had been publicly available since 2014.

179.   Gravitas Ventures further made the defamatory impact of its publication worse by representing that the Documentary Film was based upon years of research.

180.   Gravitas Ventures relied upon altered clips of interviews that it did not create itself to convey a distorted perception to the audience that the Bells were involved in the Decedent's death.

181.   Gravitas Ventures relied upon investigative documentation from investigative agencies, which necessarily means that it had access to the information from those agencies that supported the agencies' conclusions that Brian and Branden were not involved in the death of the Decedent.  Gravitas Ventures failed to publish the exculpatory information in the reports in the Documentary Film.

182.   Gravitas Ventures relied upon unreliable sources of information that were known to be unreliable to support the film's thesis that Brian and Branden committed a murder akin to the Emmett Till murder, including fundamentally misleading photographs, debunked blood spatter evidence known to have been related to a completely different episode involving none of the Bells or the Decedent, the statements of the grieving friends and family of the Decedent who have been discredited (one of whom has even been charged with fabricating false evidence to frame Brian), and information related to the execution of search

warrant of the Bells' home, without explaining that the search warrant's execution yielded no evidence of criminal conduct.

183.   Gravitas Ventures also made repetitive attacks against the Bells in the media in the advertising of the film. For example, the Documentary Film's narrator made public appearances, wherein she falsely stated that the Decedent was murdered by the Bells and that there was a great injustice.

184.   Gravitas Ventures failed to make any effort to contact what would be key witnesses in the event that he seriously considered the possibility that the Decedent was murdered, including the female that allegedly had a relationship with the Decedent that motivated Brian and Branden to murder the Decedent, Brian, Branden, Rick, Karen, the forensic analysists that concluded that the Decedent's death was accidental, the attorneys or witnesses referenced in the prior lawsuit filed by the Bells for defamation in relation to the Ebony Magazine story concerning the Decedent's death, the witnesses allegedly threatened by Rick, or any of the investigative personnel that actually made determinations concerning whether any indictment should be issued.

185.   Gravitas Ventures proceeded to "strike while the iron was hot" with publication of this at-best reckless Documentary Film without observing any professional reporting standards for fully investigating all sides of a story, without any mechanisms in place to mitigate against such a defamatory publication, all to

profit financially from public controversy and cultural salience of contemporary racial injustice.  In so doing, Gravitas Ventures ignored legitimate controversies that otherwise could have been explored and vilified completely innocent people in the tragic death of the Decedent.  Gravitas Ventures not only exploited the media landscape for his cash grab, but he also exploited the Decedent's family by adding fuel to the fire of a long-standing, but likely incorrect, belief that their son was murdered, and worse, that their son was murdered by Brian and Branden, who simply could not have murdered the Decedent.

186.   All of Gravitas Ventures' conduct was deliberately deceptive, exploitative, and fundamentally wrong, and by portraying the false narrative of a murder cover up in relation to an innately mysterious death involving a highly unusual death resulting from positional asphyxiation in a school gym mat, provided seriousness, gravitas, and renewed belief among those who viewed the publication or its advertisement that the Bells were involved in the brutal murder of an innocent child.

187.   Gravitas Ventures proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

188.    Gravitas Ventures proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

189.    The actions of Gravitas Ventures were the direct and proximate cause of damages suffered by the Bells.

190.    The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

191.    They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

192.    Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

193.    For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

194.    Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Gravitas Ventures for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

**COUNT IV – DEFAMATION AGAINST RED ARROW STUDIOS**

195.    The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

196.    This is an action against Red Arrow Studios for defamation.

197.    Red Arrow Studios took part in the publication of the Documentary Film.

198.    The Documentary Film contains multiple statements by interviewees and the narrator that indicate Brian and Branden were involved in the Decedent's murder, including, but not limited to, the following:

    a.  A statement by retired homicide detective Mitch Credle

       that there was something not "right" about the way the

case was handled because "the two persons listed as persons of interest" were the sons of an FBI agent and one of the sons was a "star athlete";

b.  A statement by the narrator that, "as the investigation heated up and students began to be subpoenaed, the story of [the Decedent] and the Bell brothers started circulating the community," and "there had definitely been some problems";

c.  A statement by the Decedent's friend that Brian was upset that the Decedent "got the best" of him during a physical altercation between the Decedent and Brian;

d.  A statement by the Decedent's father that the Decedent said Branden had been staring at him and "telling people at school that it's not over" with respect to the fight between the Decedent and Brian;

e.  A statement by the Decedent's father that Rick approached the Decedent at school and told the Decedent that the fight between the Decedent and Brian was unfair and that the Decedent should come to the Bells' house and re-fight Brian;

f.  A statement by the Decedent's friend that after the Decedent's death, Brian "started acting funny" because he had changed the routes he took to his classes and began avoiding the Decedent's friends;

g.  An excerpted news clip indicating that there was a conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, which motivated Brian to murder the Decedent;

h.  Statements by the Decedent's father that at the time of the Decedent's death, the Decedent didn't "have beef with nobody else," was not "into it with nobody else," and that the Bells "were the only ones" with whom the Decedent had conflicts;

i.  A statement by the Decedent's father that after the Decedent's death, the Bells were "the only ones that didn't get interviewed," and "didn't get questioned," and were "the only ones at the time who lawyered up";

j.  Statements by the Decedent's aunt that the "coverup" of the Decedent's death began with "one of their own GBI agents and his children," that "trickled down to the

medical examiner" and the funeral home, and that all the individuals involved were going to great lengths "just to cover for these children";

k. A rhetorical question by a producer off-screen that indicated seven judges would not have recused themselves if "an FBI agent's children" had not been responsible for the Decedent's death; and

l. A statement by the narrator, referring to Brian, that "seeing the alleged killer of KJ standing next to him in the hallway the day he died in school has sent chills down our spines."

199. The Documentary also contains multiple statements by interviewees and the narrator that indicate that Rick covered up the Decedent's murder because his sons were involved in it, that he abused his connections at the FBI, and that he committed obstruction of justice, including, but not limited to, the following:

a. A statement by the Decedent's aunt that individuals attempting to come forward with the truth were "going to jail" and "being threatened";

b.  A statement by the Decedent's mother that Michael Moore, the attorney who oversaw the investigation of the Decedent's death was "scared" out of his job by the Bells;

c.  A statement by Mitch Credle that Rick met with, followed, and intimidated witnesses in the case and "interfere[d] with a grand jury investigation";

d.  A statement by Mitch Credle that he and other former investigators in the case "thought they got to the point where either [they] were going to make an arrest of [Rick], or he may have been getting indicted";

e.  A statement by Mitch Credle that after the case was dismissed, he "really thought they must have struck a deal with Rick Bell";

f.  Statements by the Decedent's father that the Department of Justice had evidence of Rick's corruption, which they were planning to turn over to the FBI, and that Rick was subsequently forced to resign from his job with the FBI; and

g. A statement by Mitch Credle that if the investigation would have continued, he "felt as though" Rick would have been arrested for obstruction of justice.

200.   It is false that "problems," such as the fight or the Decedent's alleged relationship with Brian's girlfriend, catalyzed any involvement by Brian or Branden in the Decedent's death.

201.   It is also false that the Brian and Branden did not get questioned or interviewed by law enforcement and that this purported absence of questioning and interviewing indicates they were involved in the Decedent's death.

202.   Moreover, it is false that the investigating agencies, such as the FBI, were covering up for Brian and Branden because the brothers were involved in the Decedent's death.

203.   Additionally, it is untrue that seven judges recused themselves because Brian and Branden, the sons of an FBI agent, were involved in the Decedent's death.

204.   It is false that the Bells intimidated Michael Moore into leaving his position as U.S. Attorney for the Middle District of Georgia.

205.   Similarly, it is a misrepresentation that Brian is the "alleged killer" of the Decedent. In reality, at the time the Documentary was produced, Brian was not a suspect of any investigation. He was eliminated as a potential suspect, and

it is not even the position of any investigating body that the Decedent was actually murdered.

206.   Further, false that "problems," such as the fight or the Decedent's alleged relationship with Brian's girlfriend, catalyzed any involvement by Brian or Branden in the Decedent's death.

207.   It is also false that the Brian and Branden did not get questioned or interviewed by law enforcement and that this purported absence of questioning and interviewing indicates they were involved in the Decedent's death.

208.   Moreover, it is false that the investigating agencies, such as the FBI, were covering up for Brian and Branden because the brothers were involved in the Decedent's death.

209.   Additionally, it is untrue that seven judges recused themselves because Brian and Branden, the sons of an FBI agent, were involved in the Decedent's death.

210.   It is false that the Bells intimidated Michael Moore into leaving his position as U.S. Attorney for the Middle District of Georgia.

211.   Similarly, it is a misrepresentation that Brian is the "alleged killer" of the Decedent. In reality, at the time the Documentary was produced, Brian was not a suspect of any investigation. He was eliminated as a potential suspect, and

it is not even the position of any investigating body that the Decedent was actually murdered.

212.   Further, it is false that individuals with information about the Decedent's death were being threatened or going to jail, and it is false that Rick met with, followed, and intimidated witnesses in the case.

213.   Finally, it is untrue that Rick engaged in obstruction of justice, impeded the investigation of the Decedent's death, or was forced to resign because evidence of his corruption was uncovered. Rick retired from the FBI by choice in December 2016 with full benefits.

214.   The Documentary conveys false information and misrepresentations to persuade the audience, based on such false representations, that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent.

215.   It also puts forth false, unsupported, and erroneous information to create the false narrative that Rick used his influence and connections as an FBI agent as well as intimidation tactics to obstruct justice and orchestrate a coverup of his sons' involvement in the Decedent's death.

216.   The Documentary's defamatory statements concerning Brian and Branden imputed to them the criminal conduct of committing murder, brought them into ill repute, and undermined their integrity in every conceivable manner.

217.   The Documentary's defamatory statements concerning Rick represent that he is guilty of committing the criminal offense of obstruction of justice, witness tampering, destruction of evidence, and abuse of process, which not only brought him into ill repute and undermined his integrity, but also imputed to him conduct and characteristics that are incompatible with his position as an FBI agent.

218.   Red Arrow Studios published the Documentary, which contained these false and defamatory statements against Rick, Brian, and Branden, even though he knew, or should have known, based on the copious availability of sufficient evidence showing as much, that such statements were false.

219.   In publishing the Documentary, Red Arrow Studios failed to include known facts that would exculpate the Bells and omitted pertinent information to persuade the audience of the Documentary Film of the false impression that Brian and Branden murdered the Decedent and that Rick helped cover it up.

220.   Red Arrow Studios intentionally omitted virtually all of the material facts that resulted in the clearing of the Bells which include, but are not limited to, the following: that video surveillance confirmed that Brian did not enter the Lowndes County High School gym on the day of the Decedent's death, that Branden was on the way to a wrestling match in Macon, Georgia, that the timing of the Decedent's death clearly demonstrates that Brian and Branden were not

anywhere near the Decedent's location when he died or was killed, all based upon actual surveillance footage, and that the FBI reported in 2014 that it was certain no coverup or conspiracy occurred.

221.    Red Arrow Studios was aware of the animosity that existed between the interviewees featured in the Documentary and the Bells. For instance, the Documentary contained statements by the Decedent's friends and family, who had been hostile toward the Bell family since rumors of the Bells' alleged involvement in the Decedent's death had begun circulating. Despite this knowledge, Red Arrow Studios included these statements, unchecked and uncontradicted, and offered no disclaimers about these biases.

222.    Moreover, Red Arrow Studios emphasized insignificant events, such as the fight and the purported conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, to support the defamatory misrepresentation that Brian murdered the Decedent.

223.    In reality, there was no involvement between the Decedent and Brian's girlfriend, and the relationship between Brian and the Decedent was not a feud as described by the Documentary Film.

224.    Finally, prior the Documentary's publication, Red Arrow Studios was aware that investigative agencies, including the Lowndes County Sheriff's Office, the Georgia Bureau of Investigation, and the Department of Justice, failed to take

any action against the Bells. Notwithstanding that multiple investigative agencies chose not to prosecute any of the Bells for any crime all with their own independent investigations of the matter, Red Arrow Studios published the Documentary, which presents Brian and Branden as murderers and Rick as using his position in the FBI to conceal the involvement of his sons in the murder.

225.   Red Arrow Studios' publication of the debunked theory that Brian and Branden murdered the Decedent was reckless and ignored information that had been publicly available since 2014.

226.   Red Arrow Studios further made the defamatory impact of its publication worse by representing that the Documentary Film was based upon years of research.

227.   Red Arrow Studios relied upon altered clips of interviews that it did not create itself to convey a distorted perception to the audience that the Bells were involved in the Decedent's death.

228.   Red Arrow Studios relied upon investigative documentation from investigative agencies, which necessarily means that it had access to the information from those agencies that supported the agencies' conclusions that Brian and Branden were not involved in the death of the Decedent.  Red Arrow Studios failed to publish the exculpatory information in the reports in the Documentary Film.

229.   Red Arrow Studios relied upon unreliable sources of information that were known to be unreliable to support the film's thesis that Brian and Branden committed a murder akin to the Emmett Till murder, including fundamentally misleading photographs, debunked blood spatter evidence known to have been related to a completely different episode involving none of the Bells or the Decedent, the statements of the grieving friends and family of the Decedent who have been discredited (one of whom has even been charged with fabricating false evidence to frame Brian), and information related to the execution of search warrant of the Bells' home, without explaining that the search warrant's execution yielded no evidence of criminal conduct.

230.   Red Arrow Studios also made repetitive attacks against the Bells in the media in the advertising of the film. For example, the Documentary Film's narrator made public appearances, wherein she falsely stated that the Decedent was murdered by the Bells and that there was a great injustice.

231.   Red Arrow Studios failed to make any effort to contact what would be key witnesses in the event that he seriously considered the possibility that the Decedent was murdered, including the female that allegedly had a relationship with Decedent that motivated Brian and Branden to murder the Decedent, Brian, Branden, Rick, Karen, the forensic analysts that concluded that the Decedent's death was accidental, the attorneys or witnesses referenced in the prior lawsuit

filed by the Bells for defamation in relation to the Ebony Magazine story concerning the Decedent's death, the witnesses allegedly threatened by Rick, or any of the investigative personnel that actually made determinations concerning whether any indictment should be issued.

232.   Red Arrow Studios proceeded to "strike while the iron was hot" with publication of this at-best reckless Documentary Film without observing any professional reporting standards for fully investigating all sides of a story, without any mechanisms in place to mitigate against such a defamatory publication, all to profit financially from public controversy and cultural salience of contemporary racial injustice.  In so doing, Red Arrow Studios ignored legitimate controversies that otherwise could have been explored and vilified completely innocent people in the tragic death of the Decedent.  Red Arrow Studios not only exploited the media landscape for his cash grab, but he also exploited the Decedent's family by adding fuel to the fire of a long-standing, but likely incorrect, belief that their son was murdered, and worse, that their son was murdered by Brian and Branden, who simply could not have murdered the Decedent.

233.   All of Red Arrow Studios' conduct was deliberately deceptive, exploitative, and fundamentally wrong, and by portraying the false narrative of a murder cover up in relation to an innately mysterious death involving a highly unusual death resulting from positional asphyxiation in a school gym mat,

provided seriousness, gravitas, and renewed belief among those who viewed the publication or its advertisement that the Bells were involved in the brutal murder of an innocent child.

234.   Red Arrow Studios proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

235.   Red Arrow Studios proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

236.   The actions of Red Arrow Studios were the direct and proximate cause of damages suffered by the Bells.

237.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

238.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

239.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the

Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

240.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

241.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Red Arrow Studios for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages,  and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT V – DEFAMATION BY IMPLICATION
## AGAINST JASON POLLOCK

242.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

243.   This is an action against Jason Pollock for defamation by implication.

244.   Jason Pollock took part in the publication of the Documentary Film.

245.   Pleading in the alternative to Count I, *supra*, the Documentary Film contains statements which amount to defamation by implication with respect to the Bells.

246.   The Documentary Film contains interviews with the Decedent's friends and family members, who state that a fight between Brian and the Decedent created ill will between Brian and the Decedent, ultimately leading to Brian's involvement in the Decedent's murder.

247.   The Documentary Film also presents an excerpt from a news broadcast addressing an unsupported rumor that a conflict between the Decedent and Brian over the Decedent's alleged involvement with Brian's girlfriend provided another motive for Brian to murder the Decedent.

248.   Furthermore, the Documentary Film incorporates statements by various individuals, including the Decedent's family members and Mitch Credle, that express that Brian and Branden suffered no consequences for their involvement in the Decedent's death because their father was an FBI agent.

249.   The Documentary Film repeatedly presents the Decedent's death as a murder with earie similarities to the murder of Emmett Till, often characterizing Brian and Branden as the "Bell Brothers" to link them to the brothers that murdered Emmett Till, and presenting the narrative that the Decedent's murder was motivated by an interaction with a Caucasian female.  All of this is false, and

to the extent that it is conceivable that the film can be viewed in a manner other than portraying the Bells as murderers, it is the only conclusion the audience is left to draw from the Documentary Film.

250.   In addition, the Documentary Film includes statements made by the Decedent's friend that Brian exhibited suspicious behavior after the Decedent's death due to Brian's involvement in it.

251.   Moreover, the Documentary Film features statements made by the Decedent's family members and Mitch Credle that indicate Rick interfered with the investigation of the Decedent's death to cover up his sons' participation in it.

252.   These statements set forth in the Documentary Film, at a minimum, create a false impression in the mind of the viewer that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent and that Rick committed obstruction of justice, witness tampering, and destruction of evidence with respect to the investigation for the benefit of his sons.

253.   Jason Pollock, in publishing the Documentary, juxtaposed these statements in a manner that implied a defamatory connection between them, and he omitted key facts to convey false implications that materially diverge from reality.

254.   Jason Pollock knew, or should have known, that the Documentary defamed the Bells by implication, but he published the statements anyway.

255.   Jason Pollock proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

256.   Jason Pollock proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

257.   The actions of Jason Pollock were the direct and proximate cause of damages suffered by the Bells.

258.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

259.   They have also been targets of hatred, threats, and false accusations that have overwhelmed since the widespread publication of the Documentary Film.

260.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the

Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

261.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

262.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Jason Pollock for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT VI – DEFAMATION BY IMPLICATION
## AGAINST BOOM CONTENT

263.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

264.   This is an action against Boom Content for defamation by implication.

265.   Boom Content took part in the publication of the Documentary Film.

266.   Pleading in the alternative to Count I, *supra*, the Documentary Film contains statements which amount to defamation by implication with respect to the Bells.

267.   The Documentary Film contains interviews with the Decedent's friends and family members, who state that a fight between Brian and the Decedent created ill will between Brian and the Decedent, ultimately leading to Brian's involvement in the Decedent's murder.

268.   The Documentary Film also presents an excerpt from a news broadcast addressing an unsupported rumor that a conflict between the Decedent and Brian over the Decedent's alleged involvement with Brian's girlfriend provided another motive for Brian to murder the Decedent.

269.   Furthermore, the Documentary Film incorporates statements by various individuals, including the Decedent's family members and Mitch Credle, that express that Brian and Branden suffered no consequences for their involvement in the Decedent's death because their father was an FBI agent.

270.   The Documentary Film repeatedly presents the Decedent's death as a murder with earie similarities to the murder of Emmett Till, often characterizing Brian and Branden as the "Bell Brothers" to link them to the brothers that murdered Emmett Till, and presenting the narrative that the Decedent's murder was motivated by an interaction with a Caucasian female.  All of this is false, and

to the extent that it is conceivable that the film can be viewed in a manner other than portraying the Bells as murderers, it is the only conclusion the audience is left to draw from the Documentary Film.

271.   In addition, the Documentary Film includes statements made by the Decedent's friend that Brian exhibited suspicious behavior after the Decedent's death due to Brian's involvement in it.

272.   Moreover, the Documentary Film features statements made by the Decedent's family members and Mitch Credle that indicate Rick interfered with the investigation of the Decedent's death to cover up his sons' participation in it.

273.   These statements set forth in the Documentary Film, at a minimum, create a false impression in the mind of the viewer that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent and that Rick committed obstruction of justice, witness tampering, and destruction of evidence with respect to the investigation for the benefit of his sons.

274.   Boom Content, in publishing the Documentary, juxtaposed these statements in a manner that implied a defamatory connection between them, and it omitted key facts to convey false implications that materially diverge from reality.

275.    Boom Content knew, or should have known, that the Documentary defamed the Bells by implication, but it published the statements anyway.

276.    Boom Content proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

277.    Boom Content proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

278.    The actions of Boom Content were the direct and proximate cause of damages suffered by the Bells.

279.    The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

280.    They have also been targets of hatred, threats, and false accusations that have overwhelmed since the widespread publication of the Documentary Film.

281.  Brian  and  Branden  have  had  extreme  difficulties  obtaining employment because the film has rendered them un-hirable to prospective employers who  do  not  have  the  time  to  investigate  the  false  claims  of  the

Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

282.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

283.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Boom Content for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT VII – DEFAMATION BY IMPLICATION
## AGAINST GRAVITAS VENTURES

284.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

285.   This is an action against Gravitas Ventures for defamation by implication.

286.   Gravitas Ventures took part in the publication of the Documentary Film.

287.   Pleading in the alternative to Count I, *supra*, the Documentary Film contains statements which amount to defamation by implication with respect to the Bells.

288.   The Documentary Film contains interviews with the Decedent's friends and family members, who state that a fight between Brian and the Decedent created ill will between Brian and the Decedent, ultimately leading to Brian's involvement in the Decedent's murder.

289.   The Documentary Film also presents an excerpt from a news broadcast addressing an unsupported rumor that a conflict between the Decedent and Brian over the Decedent's alleged involvement with Brian's girlfriend provided another motive for Brian to murder the Decedent.

290.   Furthermore, the Documentary Film incorporates statements by various individuals, including the Decedent's family members and Mitch Credle, that express that Brian and Branden suffered no consequences for their involvement in the Decedent's death because their father was an FBI agent.

291.   The Documentary Film repeatedly presents the Decedent's death as a murder with earie similarities to the murder of Emmett Till, often characterizing Brian and Branden as the "Bell Brothers" to link them to the brothers that

murdered Emmett Till, and presenting the narrative that the Decedent's murder was motivated by an interaction with a Caucasian female.  All of this is false, and to the extent that it is conceivable that the film can be viewed in a manner other than portraying the Bells as murderers, it is the only conclusion the audience is left to draw from the film.

292.   In addition, the Documentary Film includes statements made by the Decedent's friend that Brian exhibited suspicious behavior after the Decedent's death due to Brian's involvement in it.

293.   Moreover, the Documentary Film features statements made by the Decedent's family members and Mitch Credle that indicate Rick interfered with the investigation of the Decedent's death to cover up his sons' participation in it.

294.   These statements set forth in the Documentary Film, at a minimum, create a false impression in the mind of the viewer that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent and that Rick committed obstruction of justice, witness tampering, and destruction of evidence with respect to the investigation for the benefit of his sons.

295.   Gravitas Ventures, in publishing the Documentary, juxtaposed these statements in a manner that implied a defamatory connection between them, and

it omitted key facts to convey false implications that materially diverge from reality.

296.   Gravitas Ventures knew, or should have known, that the Documentary defamed the Bells by implication, but it published the statements anyway.

297.   Gravitas Ventures proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

298.   Gravitas Ventures proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

299.   The actions of Gravitas Ventures were the direct and proximate cause of damages suffered by the Bells.

300.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

301.   They have also been targets of hatred, threats, and false accusations that have overwhelmed since the widespread publication of the Documentary Film.

302.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

303.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

304.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Gravitas Ventures for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT VIII – DEFAMATION BY IMPLICATION AGAINST RED ARROW STUDIOS

305.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

306.   This is an action against Red Arrow Studios for defamation by implication.

307.   Red Arrow Studios took part in the publication of the Documentary Film.

308.   Pleading in the alternative to Count I, *supra*, the Documentary Film contains statements which amount to defamation by implication with respect to the Bells.

309.   The Documentary Film contains interviews with the Decedent's friends and family members, who state that a fight between Brian and the Decedent created ill will between Brian and the Decedent, ultimately leading to Brian's involvement in the Decedent's murder.

310.   The Documentary Film also presents an excerpt from a news broadcast addressing an unsupported rumor that a conflict between the Decedent and Brian over the Decedent's alleged involvement with Brian's girlfriend provided another motive for Brian to murder the Decedent.

311.   Furthermore, the Documentary incorporates statements by various individuals, including the Decedent's family members and Mitch Credle, that express that Brian and Branden suffered no consequences for their involvement in the Decedent's death because their father was an FBI agent.

312.    The Documentary Film repeatedly presents the Decedent's death as a murder with earie similarities to the murder of Emmett Till, often characterizing Brian and Branden as the "Bell Brothers" to link them to the brothers that murdered Emmett Till, and presenting the narrative that the Decedent's murder was motivated by an interaction with a Caucasian female.  All of this is false, and to the extent that it is conceivable that the film can be viewed in a manner other than portraying the Bells as murderers, it is the only conclusion the audience is left to draw from the Documentary Film.

313.    In addition, the Documentary Film includes statements made by the Decedent's friend that Brian exhibited suspicious behavior after the Decedent's death due to Brian's involvement in it.

314.    Moreover, the Documentary Film features statements made by the Decedent's family members and Mitch Credle that indicate Rick interfered with the investigation of the Decedent's death to cover up his sons' participation in it.

315.    These statements set forth in the Documentary Film, at a minimum, create a false impression in the mind of the viewer that Brian, alone or with the assistance of Branden or other Lowndes County High School students, murdered the Decedent and that Rick committed obstruction of justice, witness tampering, and destruction of evidence with respect to the investigation for the benefit of his sons.

316.    Red Arrow Studios, in publishing the Documentary, juxtaposed these statements in a manner that implied a defamatory connection between them, and it omitted key facts to convey false implications that materially diverge from reality.

317.    Red Arrow Studios knew, or should have known, that the Documentary defamed the Bells by implication, but it published the statements anyway.

318.    Red Arrow Studios proceeded with this publication although multiple law enforcement agencies never even sought an indictment of the Bells, all reaching the same conclusion.

319.    Red Arrow Studios proceeded with this publication in spite of the fact that no media sources persisted in publishing false representations or innuendo suggesting that Brian and Branden were involved in the death of the Decedent.

320.    The actions of Red Arrow Studios were the direct and proximate cause of damages suffered by the Bells.

321.    The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

322.   They have also been targets of hatred, threats, and false accusations that have overwhelmed since the widespread publication of the Documentary Film.

323.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

324.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

325.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Red Arrow Studios for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT IX – NEGLIGENCE AGAINST JASON POLLOCK

326.    The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

327.    This is an action against Jason Pollock for negligence.

328.    At all material times hereto, Jason Pollock owed the Bells a duty to verify the facts surrounding the Decedent's death and not present them in a manner that defames the Bells.

329.    Jason Pollock breached this duty by failing to exercise due care in verifying all the facts related to the Decedent's death and failing to convey them in a fair and accurate way so as not to misrepresent the Bells' involvement in the Decedent's death, thereby defaming them.

330.    Jason Pollock acted below any reasonable standard of care in his role as a publisher, as any reasonable publisher would avoid significant misrepresentations that implicate private individuals in infamous crimes such as a brutal murder of a child and obstruction of justice.

331.    It is reasonably foreseeable that misrepresentations in publishing that falsely impute criminal conduct to individuals could reasonably result in those individuals experiencing reputational damage and humiliation and becoming the targets of threats, violence, exclusion, and hatred.

332.   The negligent actions of Jason Pollock were the direct and proximate cause of damages suffered by the Bells.

333.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

334.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

335.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

336.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

337.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Jason Pollock for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damage, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT X – NEGLIGENCE AGAINST BOOM CONTENT

338.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

339.   This is an action against Boom Content for negligence.

340.   At all material times hereto, Boom Content owed the Bells a duty to verify the facts surrounding the Decedent's death and not present them in a manner that defames the Bells.

341.   Boom Content breached this duty by failing to exercise due care in verifying all the facts related to the Decedent's death and failing to convey them in a fair and accurate way so as not to misrepresent the Bells' involvement in the Decedent's death, thereby defaming them.

342.   Boom Content acted below any reasonable standard of care in its role of publisher, as any reasonable publisher would avoid significant misrepresentations that implicate private individuals in infamous crimes such as a brutal murder of a child and obstruction of justice.

343.   It is reasonably foreseeable that misrepresentations in publishing that falsely impute criminal conduct to individuals could reasonably result in those individuals experiencing reputational damage and humiliation and becoming the targets of threats, violence, exclusion, and hatred.

344.   The negligent actions of Boom Content were the direct and proximate cause of damages suffered by the Bells.

345.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

346.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

347.  Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

348.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

349.     Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Boom Content for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

### COUNT XI – NEGLIGENCE AGAINST GRAVITAS VENTURES

350.     The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

351.     This is an action against Gravitas Ventures for negligence.

352.     At all material times hereto, Gravitas Ventures owed the Bells a duty to verify the facts surrounding the Decedent's death and not present them in a manner that defames the Bells.

353.     Gravitas Ventures breached this duty by failing to exercise due care in verifying all the facts related to the Decedent's death and failing to convey them in a fair and accurate way so as not to misrepresent the Bells' involvement in the Decedent's death, thereby defaming them.

354.     Gravitas Ventures acted below any reasonable standard of care in its role of publishers, as any reasonable publisher would avoid significant misrepresentations that implicate private individuals in infamous crimes such as a brutal murder of a child and obstruction of justice.

355.     It is reasonably foreseeable that misrepresentations in publishing that falsely impute criminal conduct to individuals could reasonably result in those individuals experiencing reputational damage and humiliation and becoming the targets of threats, violence, exclusion, and hatred.

356.     The negligent actions of Gravitas Ventures were the direct and proximate cause of damages suffered by the Bells.

357.     The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

358.     They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

359.     Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the

Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

360.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

361.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Gravitas Ventures for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT XII – NEGLIGENCE AGAINST RED ARROW STUDIOS

362.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

363.   This is an action against Red Arrow Studios for negligence.

364.    At all material times hereto, Red Arrow Studios owed the Bells a duty to verify the facts surrounding the Decedent's death and not present them in a manner that defames the Bells.

365.    Red Arrow Studios breached this duty by failing to exercise due care in verifying all the facts related to the Decedent's death and failing to convey them in a fair and accurate way so as not to misrepresent the Bells' involvement in the Decedent's death, thereby defaming them.

366.    Red Arrow Studios acted below any reasonable standard of care in its role of publishers, as any reasonable publisher would avoid significant misrepresentations that implicate private individuals in infamous crimes such as a brutal murder of a child and obstruction of justice.

367.    It is reasonably foreseeable that misrepresentations in publishing that falsely impute criminal conduct to individuals could reasonably result in those individuals experiencing reputational damage and humiliation and becoming the targets of threats, violence, exclusion, and hatred.

368.    The negligent actions of Red Arrow Studios were the direct and proximate cause of damages suffered by the Bells.

369.    The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

370.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

371.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

372.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

373.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Red Arrow Studios for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT XIII – UNAUTHORIZED MISAPPROPRIATION OF
## LIKENESS AGAINST JASON POLLOCK

374.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

375.   This is an action against Jason Pollock for unauthorized misappropriation of likeness.

376.   Rick, Karen, Brian, and Branden each have a common law right of publicity.[2]

377.   Jason Pollock may not publish, print, display, or otherwise publicly use the names, images, or likenesses of the Bells for any commercial purpose without the Bells' express written or oral consent to such use.

378.   Jason Pollock published, displayed, and publicly used the names, images, and likenesses of the Bells in the Documentary Film, which was produced for the commercial purposes of distribution to online streaming platforms and for sale to consumers.

379.   Jason Pollock took these actions without the Bells' consent, permission, or authority and never sought such permission or authority.

380.   Jason Pollock intentionally, or at least recklessly, published, displayed, and used the Bells' names, images, and likenesses for the commercial

---

[2] Florida recognizes a common law right of publicity. *Weaver v. Meyers*, 229 So. 3d 1118, 1154, n. 2 (Fla. 2017). The right of publicity refers to a person's right to "control the use of his or her name and likeness." *Id.*

purpose of creating the Documentary, which was distributed to paying consumers.

381.   Jason Pollock has caused irreparable harm to the Bells' reputations and endangered their safety by associating their names and images with the infamous crimes of murder and obstruction of justice.

382.   Jason Pollock's unauthorized use of the names, likenesses, and images of the Bells was the direct and proximate cause of damages suffered by the Bells.

383.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

384.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

385.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

386.    For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

387.    Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Jason Pollock for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

### COUNT XIV- UNAUTHORIZED MISAPPROPRIATION OF LIKENESS AGAINST BOOM CONTENT

388.    The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

389.    This is an action against Boom Content for unauthorized misappropriation of likeness.

390.    Rick, Karen, Brian, and Branden each have a common law right of publicity.

391.   Boom Content may not publish, print, display, or otherwise publicly use the names, images, or likenesses of the Bells for any commercial purpose without the Bells' express written or oral consent to such use.

392.   Defendants published, displayed, and publicly used the names, images, and likenesses of the Bells in the Documentary Film, which was produced for the commercial purposes of distribution to online streaming platforms and for sale to consumers.

393.   Boom Content took these actions without the Bells' consent, permission, or authority and never sought such permission or authority.

394.   Boom Content intentionally, or at least recklessly, published, displayed, and used the Bells' names, images, and likenesses for the commercial purpose of creating the Documentary, which was distributed to paying consumers.

395.   Boom Content has caused irreparable harm to the Bells' reputations and endangered their safety by associating their names and images with the infamous crimes of murder and obstruction of justice.

396.   Boom Content's unauthorized use of the names, likenesses, and images of the Bells was the direct and proximate cause of damages suffered by the Bells.

397.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

398.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

399.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

400.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

401.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Boom Content for actual and compensatory damages in excess of $75,000, exclusive of interests and

costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT XV – UNAUTHORIZED MISAPPROPRIATION OF LIKENESS AGAINST GRAVITAS VENTURES

402.    The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

403.   This is an action against Gravitas Ventures for unauthorized misappropriation of likeness.

404.    Rick, Karen, Brian, and Branden each have a common law right of publicity.

405.    Gravitas Ventures may not publish, print, display, or otherwise publicly use the names, images, or likenesses of the Bells for any commercial purpose without the Bells' express written or oral consent to such use.

406.    Gravitas Ventures published, displayed, and publicly used the names, images, and likenesses of the Bells in the Documentary Film, which was produced for the commercial purposes of distribution to online streaming platforms and for sale to consumers.

407.    Gravitas Ventures took these actions without the Bells' consent, permission, or authority and never sought such permission or authority.

408.   Gravitas Ventures intentionally, or at least recklessly, published, displayed, and used the Bells' names, images, and likenesses for the commercial purpose of creating the Documentary, which was distributed to paying consumers.

409.   Gravitas Ventures caused irreparable harm to the Bells' reputations and endangered their safety by associating their names and images with the infamous crimes of murder and obstruction of justice.

410.   Gravitas Ventures' unauthorized use of the names, likenesses, and images of the Bells was the direct and proximate cause of damages suffered by the Bells.

411.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

412.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

413.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the

Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

414.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

415.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Gravitas Ventures for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT XVI – UNAUTHORIZED MISAPPROPRIATION OF LIKENESS AGAINST RED ARROW STUDIOS

416.   The Bells repeat and re-allege the allegations set forth in paragraphs 1 through 70 above, as if fully set forth herein.

417.   This is an action against Gravitas Ventures for unauthorized misappropriation of likeness.

418.   Rick, Karen, Brian, and Branden each have a common law right of publicity.

419.   Gravitas Ventures may not publish, print, display, or otherwise publicly use the names, images, or likenesses of the Bells for any commercial purpose without the Bells' express written or oral consent to such use.

420.   Gravitas Ventures published, displayed, and publicly used the names, images, and likenesses of the Bells in the Documentary Film, which was produced for the commercial purposes of distribution to online streaming platforms and for sale to consumers.

421.   Gravitas Ventures took these actions without the Bells' consent, permission, or authority and never sought such permission or authority.

422.   Gravitas Ventures intentionally, or at least recklessly, published, displayed, and used the Bells' names, images, and likenesses for the commercial purpose of creating the Documentary, which was distributed to paying consumers.

423.   Gravitas Ventures has caused irreparable harm to the Bells' reputations and endangered their safety by associating their names and images with the infamous crimes of murder and obstruction of justice.

424.   Gravitas Ventures' unauthorized use of the names, likenesses, and images of the Bells was the direct and proximate cause of damages suffered by the Bells.

425.   The Bells have suffered damage to their reputations, embarrassment, humiliation, endangerment of their physical safety, and psychological and emotional trauma.

426.   They have also been targets of hatred, threats, and false accusations that have overwhelmed the Bells since the widespread publication of the Documentary Film.

427.   Brian and Branden have had extreme difficulties obtaining employment because the film has rendered them un-hirable to prospective employers who do not have the time to investigate the false claims of the Documentary Film and who cannot otherwise afford to be implicated in the possibility that they could be employing murderers.

428.   For example, Brian was turned away from employment at three county sheriff's offices, despite possessing qualifications that exceed the job requirements.

429.   Similarly, Rick's professional legacy has been destroyed by the notion that he was involved in covering up a murder and obstructing justice, when in

reality, his career was dedicated to anti-terrorism to protect the citizens of the United States from acts of foreign and domestic terror.

WHEREFORE, the Bells demand judgement against Gravitas Ventures for actual and compensatory damages in excess of $75,000, exclusive of interests and costs, punitive damages, and an award of costs and interest, including, but not limited to attorneys' fees and costs and such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs, the Bells, demand a trial by jury on all issues so triable.

Dated this 22nd day of November, 2022.

BLEAKLEY BAVOL DENMAN & GRACE

*/s/ J. Ronald Denman*
J. Ronald Denman, Esq.
Florida Bar No.: 0863475
Grant W. Kindrick, Esq.
Florida Bar No.: 0086950
15170 N. Florida Avenue
Tampa, Florida 33613
Telephone: (813) 221-3759
rdenman@bbdglaw.com
gkindrick@bbdglaw.com
eservice@bbdglaw.com
*(Counsel for Plaintiffs)*
