## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**RICK BELL, KAREN BELL,**
**BRIAN BELL, and BRANDEN**
**BELL,**

      **Plaintiffs,**

**v.**                     **Case No: 8:22-cv-02677-MSS-CPT**

**JASON POLLOCK, NEWMAN**
**PRODUCTIONS, LLC d/b/a BOOM**
**CONTENT, GRAVITAS VENTURES,**
**LLC, and RED ARROW STUDIOS**
**INTERNATIONAL, INC.,**

      **Defendants.**

_____

## ORDER

    **THIS CAUSE** comes before the Court for consideration of Defendants Jason Pollock, Newman Productions, LLC, and Gravitas Ventures, LLC's Motion to Dismiss, (Dkt. 29), Plaintiffs' response in opposition, (Dkt. 45), and Defendants' reply in opposition thereto. (Dkt. 52) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Dismiss.

## I.    BACKGROUND

    Plaintiffs Richard Bell ("Rick"), Karen Bell ("Karen"), Brian Bell ("Brian"), and Branden Bell ("Branden") (collectively referred to as "Plaintiffs" or the "Bells")

initiated this action against Defendants Jason Pollock, Newman Productions, LLC d/b/a Boom Content ("Newman Productions"), Gravitas Ventures, LLC ("Gravitas Ventures"), and Red Arrow Studios International, Inc.[1] (Dkt. 1) In the Complaint, (Dkt. 16), the Bells seek monetary damages for Defendants' alleged publication of false and defamatory statements of and concerning Rick, Brian, and Branden. The Complaint also asserts claims for misappropriation of images, names, and likenesses on behalf of Karen, Rick, Brian, and Branden. Plaintiffs allege the following facts to support their claims. Plaintiffs are all private citizens who have not sought any form of publicity or prominence outside of their own private affairs. (Id. at ¶¶ 2, 4, 6, 8)

The Complaint relates to the contents of a documentary film called *Finding Kendrick Johnson* (the "Film"), which was first released on July 30, 2021. (Id. at ¶ 27) By December 27, 2021, internet users could stream the Film on multiple online platforms. (Id.) Jason Pollock directed the Film, Newman Productions produced the Film, and Gravitas Ventures and Red Arrow Studios distributed the Film. (Id. at ¶ 28) Since its release, the Film has been streamed and viewed thousands of times. (Id.)

The Film is about the death of Kendrick Johnson, a Lowndes County High School student. (Id. at ¶ 29) In January 2013, Kendrick's body was discovered inside a rolled-up gym mat in his high school's gym. (Id. at ¶ 29) On January 14, 2013, the Georgia Bureau of Investigation (the "GBI") conducted an autopsy on Kendrick's body. (Id. at ¶ 45) Following the autopsy, the GBI concluded positional asphyxiation

---

[1] Red Arrow Studios International, Inc. was dismissed from this action without prejudice on May 25, 2023. (Dkt. 55)

caused Kendrick's death and the death was accidental. (Id.) Investigators theorized Kendrick had stored his shoes at the bottom of one of the vertically positioned, rolled-up gym mats. (Id. at ¶ 46) According to this theory, to retrieve his shoes, Kendrick climbed atop the rolled-up mat and reached within the center. (Id.) While doing so, he lost his balance and slid into the opening in the mat's center. (Id.) He was unable to free himself and suffocated. (Id.)

The Film represents that Kendrick was murdered. (Id. at ¶ 31) Specifically, the Film represents Brian and Branden killed Kendrick. (Id. at ¶¶ 32–38) Kendrick, Brian, and Branden all attended the same school. (Id. at ¶ 32) The Film notes Brian and Kendrick had previously fought physically, and it was rumored they fought because Brian's girlfriend had been romantic with Kendrick. (Id. at ¶ 38) The Film represents Brian and Brendan's father, Rick, who was an FBI agent at the time of Kendrick's death, exploited his position to conceal his sons' involvement in the murder from investigators. (Id. at ¶¶ 39–41)

The central thesis of the Film is that Kendrick's death was a "second iteration of the horrific, racially motivated murder of Emmett Till." (Id. at ¶ 33) The Film emphasizes purported similarities between Emmett Till's murder and Kendrick's death. (Id. at ¶ 35) For example, the Film juxtaposes images of Emmett Till's brutalized body with images of Kendrick's body. (Id.) Additionally, the Film illustrates the purported similarity between the people involved in Kendrick's theorized murder and Emmett Till's murder: Emmett Till and Kendrick, i.e., the young, black, male victims; the murderers, in both cases, two white brothers; and the white woman who

3

motivates the murder, *i.e.*, the woman who falsely accused Emmett Till of impropriety, and Brian's girlfriend. (Id. at ¶ 37–38)

The Film presents as a "'smoking gun'" still images from the school surveillance footage in which Brian is seen with Kendrick in the same hallway at the same time on the day of Kendrick's death. (Id. at ¶ 53) The Film's narrator states the image gave the narrator "'chills.'" (Id. at ¶ 54)

Furthermore, the Film propagates a theory that Kendrick's death was improperly ruled an accident because of a cover-up. (Id. at ¶ 39) The Film accuses Rick of obstructing justice to protect his sons from investigation for murder. (Id.) For example, the Film states Rick intimidated potential witnesses. (Id. at ¶ 40) The Film maintains Rick was forced to resign from his position because the Department of Justice discovered evidence of "corruption." (Id. at ¶ 43)

To show these representations are false, Plaintiffs allege the following. First, Plaintiffs assert Brian and Branden were not near Kendrick at the time of his death, which was determined to have occurred between 1:30 p.m. and 3:30 p.m. based on surveillance footage and a report from the Lowndes County Sheriff's Office. (Id. at ¶ 48) Brian was in class at the time of Kendrick's death. (Id. at ¶ 49) Surveillance cameras recorded him walking into class and footage shows he did not leave during the relevant period. (Id.) Moreover, surveillance footage and witness testimony confirm Brian did not enter the gym on the day of Kendrick's death. (Id. at ¶ 50) Similarly, Plaintiffs allege Branden was on a school bus traveling to an out-of-town wrestling match at the time of Kendrick's death. (Id. at ¶ 52) The bus departed around 12:30 p.m. and arrived

4

at the match just before 4:00 p.m. (Id.) Branden's location has been verified by sworn testimony, cell phone tower data, the motel check-in time, and data from the weigh-in at the wrestling match in which Branden participated. (Id.)

Plaintiffs allege the Film omits the fact that the photos of Kendrick's body which are juxtaposed with photos of Emmett Till were taken after an invasive autopsy procedure. (Id. at ¶ 36 n.1) This procedure causes the deceased's facial features to appear deformed as if brutalized by violence. (Id.)

As for the image from surveillance footage showing Brian and Kendrick in the same hallway on the day of Kendrick's death, Plaintiffs allege this image was not newly discovered and was reviewed by several investigative agencies. (Id. at ¶ 55) Although the Film represents the image as a "'smoking gun,'" Plaintiffs allege the image was neither near in time nor location to Kendrick's death. (Id.) Plaintiffs allege all this information was "widely known and publicly available" for years before the Film's publication. (Id. at ¶ 56) Yet it is omitted from the Film. (Id. at ¶ 57)

To show the representations about Rick are false, Plaintiffs allege the FBI published a letter in December 2014 "unequivocally stating there was no coverup or conspiracy" related to the investigation of Kendrick's death. (Id. at ¶ 59) Plaintiffs allege Rick retired from the FBI with full benefits on December 31, 2016; he was not forced to resign. (Id. at ¶ 62) This information is also omitted from the Film. (Id. at ¶ 63)

Plaintiffs allege that since the Film's release, they have suffered harm to their reputations, embarrassment, humiliation, physical endangerment, and psychological

and emotional trauma. (Id. at ¶ 68) They have been targets of hatred, threats, and false accusations. (Id. at ¶ 69) Plaintiffs allege Brian and Branden have struggled to obtain employment. (Id. at ¶ 70) Former friends of the Bells have disassociated from them. (Id. at ¶ 71)

In the Complaint, Plaintiffs assert claims of defamation, defamation by implication, negligence, and unauthorized misappropriation of likeness against each Defendant. Defendants Jason Pollock, Newman Productions, LLC, and Gravitas Ventures, LLC (collectively, "Defendants") move to dismiss the Complaint. (Dkt. 29) In their response to Defendants' motion, Plaintiffs voluntarily dismiss without prejudice their claims for misappropriation of likeness, contained in Counts XIII, XIV, XV, and XVI. (Dkt. 45 at 4)

Defendants argue Plaintiffs' remaining claims must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. First, Defendants argue Georgia law applies to Plaintiffs' claims and they are therefore barred by Georgia's statute of limitations. Next, Defendants argue Plaintiffs' defamation claims must be dismissed because the alleged defamatory statements are either protected opinion, privileged, or not "of and concerning" Plaintiffs. Defendants argue the defamation by implication claims must be dismissed for the same reasons as the defamation claims and, additionally, because they improperly rely on allegedly false statements. Finally, Defendants argue the negligence claims are wholly duplicative of the defamation claims and should be dismissed as in violation of the single cause of action rule under Florida law.

## II.    LEGAL STANDARD

The threshold for surviving a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a low one. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir. 1983). A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also id. at 560–562 (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in Conley v. Gibson, 355 U.S. 41, 45–46 (1957)). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief, and "a formulaic recitation of the elements of a cause of action will not do." Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting Twombly, 550 U.S. at 553–556). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994–95. However, the court should not assume that the plaintiff can prove facts that were not alleged. Id. Thus, dismissal is warranted if, assuming the truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue that precludes relief. Neitzke v. Williams, 490 U.S. 319, 326 (1989).

## III.    DISCUSSION

### a.  Choice of Law

Defendants argue Plaintiffs' defamation and defamation by implication claims should be dismissed because Florida's borrowing statute requires the Court apply Georgia's one-year statute of limitations for defamation claims. Florida's borrowing statute provides, "When the cause of action arose in another state or territory of the United States, . . . and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state." § 95.10, Fla. Stat. (2023). "'The purpose of the statute is to discourage "forum shopping" and the filing of lawsuits in Florida that have already been barred in the jurisdiction where the cause of action arose.'" Reed v. Chamblee, No. 22-cv-1059, 2023 WL 6292578, at *6 (M.D. Fla. Sept. 27, 2023) (quoting Celotex Corp. v. Meehan, 523 So. 2d 141, 143 (Fla. 1988)). Florida courts apply the "most significant relationship" test to determine choice-of-law questions in tort cases. Id. (citing Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1301 (11th Cir. 2003)). In applying the test, courts consider four factors: "'(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'" Id. (quoting Green Leaf Nursery, 341 F.3d at 1301).

Defendants argue the "most significant relationship" test weighs in favor of this Court applying Georgia law to Plaintiffs' claims. First, Defendants argue the location

of the alleged injury is primarily in Georgia. But, because the Film was available for streaming in both Georgia and Florida, Plaintiffs' injury could be found to have occurred in both states. Jaisinghani v. Capital Cities/ABC, Inc., 973 F. Supp. 1450, 1452 (S.D. Fla. 1997). Therefore, this court must determine the state in which "'the plaintiff suffered greater injury.'" Reed, 2023 WL 6292578, at *6 (quoting Nix v. ESPN, Inc., 772 F. App'x 807, 810 (11th Cir. 2019)).

The Court cannot determine whether Plaintiff suffered greater injury in Georgia or in Florida because Plaintiffs do not allege when they moved to Florida or where their injuries occurred. Courts have found the first factor inconclusive where a plaintiff does not allege where the injury occurred, even if the plaintiff alleges where they are domiciled. See Middleton v. Hollywood Reporter, LLC, 22-21951-CIV, 2023 WL 6036497, at *2 (S.D. Fla. Aug. 10, 2023) (finding first factor inconclusive even though plaintiff asserts he is domiciled in Florida because plaintiff does not allege where the injury occurred); Nix v. ESPN, Inc., No. 18-cv-22208, 2018 WL 8802885, at *4 (S.D. Fla. Aug. 30, 2018) (finding first factor weighs in favor of applying New York law because "an identifiable injury occurred there," and plaintiffs "cite no specific instances of harm in Florida"). Plaintiffs allege they are domiciled in Florida, (id. at ¶¶ 1, 3, 5, 7), but none of their allegations specify that any of their injuries occurred in Florida. Although in Plaintiffs' response to the motion to dismiss, Plaintiffs claim they have been domiciled in Florida since before the Film's release, (Dkt. 45 at 5), the Complaint contains no allegations to that effect. This Court can conclude that at least some ongoing reputational harm Plaintiffs experience occurs in Florida, the state of

their current domicile. See Klayman v. Judicial Watch, Inc., No. 07-22413, 2008 WL 11333055, at *4 (S.D. Fla. Sept. 30, 2008). But based on the allegations in the Complaint, the Court cannot determine whether Plaintiffs suffered greater injury in Georgia or Florida. The weight of the first factor is inconclusive as to which state's law should apply under Florida's borrowing statute.

Next, Defendants argue the second factor, where the alleged tortious conduct occurred, also favors Georgia. In defamation cases, this factor weighs in favor of the state in which the decision to publish the allegedly defamatory information occurred. See Nix, 772 F. App'x at 810; Klayman, 2008 WL 11333055, at *4; Middleton, 2023 WL 6036497, at *3 (finding tortious conduct occurred in California because defamatory statements were authored by California resident and published by company with principal place of business in California); Miller v. Gizmodo Media Group, LLC, No. 18-24227-CIV, 2019 WL 1790248, at *5 (S.D. Fla. Apr. 24, 2019) (holding the second factor weighs in favor of applying New York law because the allegedly defamatory article was drafted in New York, an individual defendant resides in New York, an entity defendant is headquartered in New York, and the defendants' "most significant conduct—publishing the allegedly defamatory article—took place in New York"). This factor weighs in favor of the state in which the decision to publish the information occurred even in cases where the information was published online, accessible worldwide. Id. Here, Pollock is domiciled in California. (Dkt. 16 at ¶ 9) Newman Productions is organized under the laws of Delaware and, Plaintiffs allege, has one member, Pollock. (Id. at ¶¶ 11–12) Gravitas Ventures is organized under the

10

laws of Delaware with its principal place of business in Ohio. (Id. at ¶ 14) Plaintiffs allege no other facts in the Complaint to permit this Court to determine where Defendants made the decision to publish the allegedly defamatory information. None of the alleged facts weigh in favor of applying Georgia or Florida law. This Court, therefore, finds the second factor inconclusive as to which state's law should apply to Plaintiffs' claims.

The third factor considers the parties' domicile, residence, nationality, place of incorporation, and place of business. As noted above, Plaintiffs allege they are domiciled in Florida. Pollock is domiciled in California. Newman Productions and Gravitas Ventures are organized under Delaware law. Newman Productions' principal place of business is unknown, and Gravitas Ventures' principal place of business is in Ohio. None of the Complaint's allegations regarding the Parties' domicile weigh in favor of applying Georgia law. Plaintiffs' current domicile in Florida weighs in favor of applying Florida law since at least some ongoing reputational harm Plaintiffs allege they experience occurs in Florida. Defendants argue this factor weighs in favor of applying Georgia law because the Bells were longtime residents of Georgia, and the alleged defamatory statements concern events that occurred while they lived there.

The Court will not ignore Plaintiffs' current domicile in Florida, as Defendants urge. Cf. Jaisinghani, 973 F. Supp. at 1453–55 (finding California law applied because the plaintiff's current residency in Florida was brief and temporary and there was evidence the plaintiff lacked intent to remain in Florida indefinitely). If Defendants obtain evidence which shows Plaintiffs lack intent to remain in Florida indefinitely,

such as evidence none of the Bells have ever tried to obtain a Florida driver's license, id. at 1454, Defendants may object to this factor weighing in favor of applying Florida law at the summary judgment stage of these proceedings. At this time and based on the allegations in the Complaint, the third factor weighs in favor of applying Florida law.

The final factor considers the place where the relationship, if any, between the parties is centered. The Parties do not have any relationship outside of this defamation suit. See Nix, 772 F. App'x at 811 (finding fourth factor of "neutral weight because the parties did not allege any relationship outside of the defamation suit"); Miller, 2019 WL 1790248, at *6 ("The fourth factor does not favor either state, as Plaintiff does not allege a relationship with Defendants aside from the alleged defamation."). For this reason, the fourth factor does not weigh in favor of applying a particular state's law.

After balancing the factors of the substantial relationship test, the Court finds that the application of Florida law to Plaintiffs' claims is appropriate. Although the allegedly defamatory statements concern events that took place in Georgia while the Bells were domiciled there, the "most significant relationship" test gives little weight to this fact in the choice-of-law determination. Plaintiffs do not specify where their injuries occurred, but at least some of the injuries Plaintiffs allege occur in Florida, which is their current state of domicile. None of the Parties are domiciled or maintain a place of business in Georgia. The other factors are either inconclusive or do not weigh in favor of applying Georgia law to Plaintiffs' claims. Accordingly, the Court

applies Florida law to Plaintiff's claims, and finds Defendants have not shown to this point in the litigation that the claims are time-barred.

### b. Defamation Claims

Defendants seek dismissal of Plaintiffs' defamation claims for reasons that vary by Plaintiff and by alleged defamatory statement. Under Florida law, the elements of defamation are: (1) publication; (2) falsity; (3) for statements on matters concerning a private person, negligence as to the falsity of the statement; (4) actual damages; and (5) defamatory nature of the statement. Turner v. Wells, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008)).

Additionally, to establish a claim of defamation, a plaintiff must show the statement was not privileged, Reed, 2023 WL 6292578, at *8 (citing Wolfson v. Kirk, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)), and the statement was "of and concerning" the plaintiff. Id. at *9 (citing Thomas v. Jacksonville Television, Inc., 699 So. 2d 800, 805 (Fla. 1st DCA 1997)); Molenda v. Hoechst Celanese Corp., 60 F. Supp. 2d 1294, 1303 (S.D. Fla. 1999). Finally, statements of opinion are generally not actionable as defamation because an opinion is not readily capable of being proven false. See Williamson v. Digital Risk, Inc., No. 18-cv-767, 2018 WL 3870064, at *4 (M.D. Fla. Aug. 15, 2018).

The Court notes at the outset that Defendants do not dispute the adequacy of the pleadings of the elements related to publication, negligence, or damages.

*Falsity*

True statements are protected from defamation actions by the First Amendment. <u>Turner</u>, 879 F.3d at 1262. Accordingly, to state a claim for defamation, a plaintiff must allege that the allegedly defamatory statements are false.

*Defamatory Nature*

"[A] defamatory statement is one that tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." <u>Jews for Jesus</u>, 997 So. 2d at 1108–09; <u>see also</u> <u>Reed</u>, 2023 WL 6292578, at *8 (noting defamatory statements are those "which naturally and proximately result in injury to another"). Whether a statement is susceptible to a defamatory interpretation is a question of law for the court. <u>Turner</u>, 879 F.3d at 1262–63.

A statement may be defamatory <u>per se</u>. Defamation <u>per se</u> "occurs when a false statement 'suggest[s] that someone has committed a dishonest or illegal act.'" <u>Reed</u>, 2023 WL 6292578, at *8 (quoting <u>Shaw v. R.J. Reynolds Tobacco Co.</u>, 818 F. Supp. 1539, 1541–42 (M.D. Fla. 1993)). A statement that is defamatory <u>per se</u> "generally 'gives rise to absolute presumption of both malice and damage.'" <u>Id.</u> (quoting <u>Corsi v. Newsmax Media, Inc.</u>, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) (internal quotations omitted)).

14

*"Of and Concerning"*

Florida law requires any alleged defamation be "of and concerning" the plaintiff. <u>Reed</u>, 2023 WL 6292578, at *9. The test is whether the average person could reasonably conclude the statement implicates the plaintiff upon reading the statement. <u>Mac Isaac v. Twitter, Inc.</u>, 557 F. Supp. 3d 1251, 1259 (S.D. Fla. 2021) (citations omitted). A statement may be "of and concerning" a person even if the statement does not name the person specifically. "Florida courts have long held that if a defamed person is not named in the defamatory publication, 'the communication as a whole [must] contain . . . sufficient facts or references from which the injured person may be determined by the persons receiving the communication.'" <u>Id.</u> at 1258 (quoting <u>Wolfson</u>, 273 So. 2d at 779).

*Protected Opinion*

Generally, "statements of pure opinion are protected from defamation actions by the First Amendment." <u>Turner</u>, 879 F.3d at 1262. "Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." <u>Id.</u> Statements of pure opinion are generally not actionable as defamation because, unlike a statement of fact, a statement of pure opinion is not readily capable of being proven false. <u>Williamson</u>, 2018 WL 3870064, at *4. Pure opinion is sometimes characterized as rhetorical hyperbole. <u>Fortson v. Colangelo</u>, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006). "The Supreme

15

Court has used various phrases to describe 'rhetorical hyperbole,' including 'imaginative expression' and 'loose, figurative, or hyperbolic language.'" Id. (citations omitted). "Although rhetorically hyperbolic statements may 'at first blush appear to be factual[,] . . . they cannot reasonably be interpreted as stating actual facts about their target.'" Id. at 1378–79 (citations omitted).

On the other hand, mixed expressions of opinion occur "when an opinion or comment [is based] upon facts regarding the plaintiff or his conduct that have not been stated in the publication or [are] assumed to exist by the parties to the communication." Turner, 879 F.3d at 1262. A mixed expression of opinion is actionable if it implies the allegation of undisclosed defamatory facts as the basis of the opinion. See id. at 1263 (quoting Stembridge v. Mintz, 652 So. 2d 444, 446 (Fla. 3d DCA 1995)); Ozyesilpinar v. Reach PLC, 365 So. 3d 453, 459 (Fla. 3d DCA 2023). If a court finds an expression of opinion implies an allegation of a defamatory fact, then a jury should decide whether a defamatory meaning is attributable to the statement. Johnson v. Clark, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007) (citing Stembridge, 652 So. 2d at 446)).

Significantly, both pure opinions and mixed expressions of opinion are actionable if the facts underlying them are false or inaccurately represented. Zimmerman v. Buttigieg, 521 F. Supp. 3d 1197, 1213 (M.D. Fla. 2021) (citing Deeb v. Saati, 778 F. App'x 683, 687–88 (11th Cir. 2019)); Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990) (stating that "even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment

16

of them is erroneous, the statement may still imply a false assertion of fact," and noting that at common law, false statements of fact, "whether expressly stated or implied from an expression of opinion," were not privileged).

For each statement alleged to be defamatory in the Complaint, the Court will quote the Film directly and, applying Florida law, determine whether Plaintiffs state a claim as to whether the statement is defamatory. The Court only considers the purported deficiencies in Plaintiffs' pleadings that Defendants raise in the motion to dismiss. The Court does not discuss the sufficiency of Plaintiffs' pleadings as to elements not challenged in Defendants' motion.

Defendants argue that none of the alleged defamatory statements or implications contained in the Complaint are "of or concerning" Karen. See Mac Isaac, 557 F. Supp. 3d at 1258. Karen is not named in any of the statements. None of the statements reference Karen or allude to any involvement or action by her at all, much less any involvement or action by her related to Kendrick's death or its investigation. To the extent Karen alleges injury due to the alleged defamation of her husband and her children, such injury does not give her standing to sue Defendants for defamation under Florida law. The Complaint fails to allege facts to show Karen has been defamed. Accordingly, the Complaint, insofar as it asserts defamation or defamation by implication claims on behalf of Karen Bell, is due to be dismissed.

### i.  Statement 1: A statement by retired homicide detective Mitch Credle that there was something not "right" about the case.

Plaintiffs allege the import of the statements by Mitch Credle below are defamatory as to Rick, Brian, and Brendan, calling them "a statement by retired homicide detective Mitch Credle that there was something not 'right' about the way the case was handled because 'the two persons listed as persons of interest' were the sons of an FBI agent and one of the sons was a 'star athlete.'" (Dkt. 16 at ¶ 75(a)) Defendants argue these statements are protected opinion incapable of being proven false. They also argue these statements concern the investigation generally, therefore, they are not "of and concerning" Plaintiffs. The transcript of the Film is as follows:

> Credle:  What made me think that everything was, um, a cover up was, for me, as a experienced homicide detective was just that first meeting with the, the medical examiner. Um, for you to relate to me the way you ruled it and why you ruled it, a red flag goes up. Something is wrong. Body parts are missing. Evidence is missing. That's another red flag. In homicide cases, even though everything is not perfect, but stuff just ain't missing like that, that's evidence. This is the first case I can recall where as we were, um, on a task force to work with the federal government in a case that far away from D.C.
> Director: Why do you think that they did that?
> Credle: Well to my understanding, um, they recused all the federal agencies for being involved in the case, therefore an outside agency, like ourselves, with homicide experience, was perfect for investigating the case.
> Director: Why would they recuse themselves?
> Credle: Because, in this particular case, the two persons who were listed as persons of interest, their father was an FBI agent. It was just something about that case that just made me feel as though, because of who was involved, you have a star athlete. He was one of the Bell boys. Star

athlete. And, the father, a decorated FBI agent. Um,
something just, just wasn't right.

The Court finds the following statement to be one of pure opinion: "It was just
something about that case that just made me feel as though, because of who was
involved, you have a star athlete. He was one of the Bell boys. Star athlete. And, the
father, a decorated FBI agent. Um, something just, just wasn't right." Credle's
"feel[ing]" that something "wasn't right" is not a fact capable of being proven false;
rather, it is his subjective impression of the investigation's circumstances. Thus, the
statement is Credle's opinion. The opinion is based on facts within the statement—
that Brian was a star athlete, and his father was an FBI agent. His opinion is also based
on additional facts stated immediately prior: "Body parts [were] missing. Evidence
[was] missing . . . ." Credle notes such circumstances are atypical for homicide
investigations. Plaintiffs do not dispute Brian was an athlete, Rick was an FBI agent,
or that evidence was missing. Thus, Plaintiffs do not argue the facts underlying the
opinion are false or inaccurately represented. For these reasons, this statement is not
actionable as defamation.

### ii. Statement 2: A statement that there had been problems between Kendrick, Brian, and Brendan.

Plaintiffs assert the statement by the Film's narrator below is defamatory. (Dkt.
16 at ¶ 75(b)) Defendants argue the statement is protected opinion, the statement is not
defamatory in nature, and the statement is not "of or concerning" Rick. The transcript
of the Film is as follows:

19

> Narrator: As the investigation heated up and students began to be subpoenaed, the story of KJ and the Bell brothers started circulating the community. There had definitely been some problems.

This statement is one of pure opinion based on facts asserted immediately following the opinion. Specifically, the statement is followed by an excerpt from a news report about a fight between Brian and Kendrick, as well as statements from Kendrick's friend about a time he watched Brian and Kendrick fight. Plaintiffs do not dispute Brian and Kendrick fought. The narrator characterizes the altercation between Brian and Kendrick as "problems." The Court finds this statement is pure opinion because it is based on facts stated within the publication. Therefore, the statement is not actionable as defamation.

### iii. Statement 3: A statement that Brian was upset that Kendrick "got the best" of him.

Plaintiffs allege the statement by Kendrick's friend below is defamatory. (Dkt. 16 at ¶ 75(c)) Defendants argue the statement is an opinion, it is not defamatory in nature, and it is not "of and concerning" Rick. The transcript of the Film is as follows:

> Kendrick's friend: I was in the seat right in front of them. Seen the whole thing. Anybody, anybody in that situation is gonna fight. So they got to fighting. He got the best of him. KJ? Brian, yeah Brian ain't like that too much.

This statement is not actionable as defamation. Kendrick's friend's perception of Brian's mental state following his altercation with Kendrick is not readily capable of being proven false. The opinion does not imply the allegation of defamatory facts, and the statement itself is not defamatory in nature, because a statement that Brian did not

like losing a fight is not damaging to his reputation. For these reasons, this statement is not actionable as defamation.

> **iv. Statement 4: A statement that Kendrick said Branden had been staring at him and "telling people at school that it's not over" about the fight with Brian.**

Plaintiffs allege the statement below is defamatory. (Dkt. 16 at ¶ 75(d)) Defendants argue "no clear meaning can be ascribed to such vague, rhetorical statements and they are otherwise not defamatory." Moreover, the statements are not "of and concerning" Brian or Rick. The transcript of the Film is as follows:

> Kendrick's father: Kendrick [came] home one day; he said, "Dad?" I said, "Yeah?" He said, "Uh, you know how you can be standing up, you know you can be standing up doing something and you just feel somebody looking at you?" I said, "Yeah." He said, "Well, I turned around and seen Branden staring at me, just standing there staring at me. And he been, I been hearing he been telling people at school that it's not over." He said, "But I ain't worried about him." [indistinct] He said, "I wish he would say something me."

These statements are not defamatory in nature. Statements that Branden stared at Kendrick and told people at school that their fight was "not over" are not damaging to Branden's reputation. Thus, the statements are not defamatory as to Branden, and are not "of and concerning" Rick or Brian. These statements are not actionable.

> **v. Statement 5: A statement that Rick approached Kendrick at school and said his fight with Brian was unfair and that Kendrick should come to the Bells' house to fight Brian again.**

Plaintiffs allege the statement below is defamatory. (Dkt. 16 at ¶ 75(e)) Defendants argue the statements are not defamatory and are not "of and concerning" Brian or Brendan. The transcript of the Film is as follows:

> Kendrick's father: So, one other day, Kendrick came home. He said, "You know Rick Bell, Brian's daddy, came up to me at school. He say, uh, he told me that the fight was on the bus, wasn't a fair fight, that I should come over to their house and refight Brian." So, I said, "Kendrick, what did you say?" He said, "I looked at him like he was crazy and I turned around and walked off."

This statement is not defamatory. A statement that Rick told Kendrick his fight with Brian was not fair and encouraged Kendrick to fight Brian again is not so damaging to Rick's reputation that it would naturally and proximately result in legally cognizable injury to Rick. Also, the statement is not "of and concerning" Branden or Brian. Accordingly, this statement is not defamatory.

> **vi. Statement 6: A statement that after Kendrick's death, Brian "started acting funny," changed the routes he took to his classes, and began avoiding Kendrick's friends.**

Plaintiffs allege the statement below is defamatory, calling it a "statement by the Decedent's friend that after the Decedent's death, Brian 'started acting funny' because he had changed the routes he took to his classes and began avoiding the Decedent's friends." (Dkt. 16 at ¶ 75(f)) Defendants argue the statement that Brian "started acting funny" is an opinion and therefore not actionable. Defendants also

argue the statement is not "of and concerning" Branden or Rick. The transcript of the Film is as follows:

> Kendrick's friend: And then we come back to school and Brian is acting funny. Usually, he'd stop by, and he'd speak to us when he walked past, walked past the wall that we sitting on in between classes. But after this happened, he takes a different route. He don't come through there no more. And this before anybody even thinking it's him, he just took it upon himself to go a different route to his classes. Why after this happened, do you start taking different routes around the school? That was like, you know, it was like a no-brainer. Like you're moving different. Why?

The Court finds the statement that Brian "started acting funny" is pure opinion based on facts stated within the same publication. Kendrick's friend states he based his opinion on the fact that Brian began taking a different route to class than he did before Kendrick's death, and, because he no longer passed Kendrick's friends, he stopped speaking to them. Kendrick's friend's impression is not readily capable of being proven false. Moreover, the conclusion Kendrick's friend impliedly draws about Brian's behavior, i.e., that it must have resulted from Brian's involvement in Kendrick's death, is an opinion based on facts stated within the publication. Therefore, this statement is not actionable.

> ### vii.  Statement 7: An excerpted news clip indicating there was a conflict between Brian and Kendrick over Kendrick's alleged involvement with Brian's girlfriend.

Plaintiffs allege the statement below is defamatory, calling it an "excerpted news clip indicating that there was a conflict between Brian and the Decedent over the Decedent's alleged involvement with Brian's girlfriend, which motivated Brian to

murder the Decedent." (Dkt. 16 at ¶ 75(g)) Defendants argue the statement is protected under the "wire service" defense, it is a "fair report" of the content of a public government record, and it is not "of and concerning" Rick or Branden. The transcript of the Film is as follows:

> News report: And now WJCL News working for you. New developments in the Kendrick Johnson death investigation. We have uncovered an email whose sender claims to know who killed Johnson. And tonight, I have been looking through these 22 pages that we requested that could possibly answer the question: "What happened to Kendrick Johnson?"
>
> Kendrick's sister: Some of the kids that that know scared but they should never be scared.
>
> News report: This week, WJCL learned U.S. Attorney Michael Moore subpoenaed more than 120 students and parents in Valdosta to testify in front of a grand jury. What happened to Kendrick last January is a question the family has been asking for more than a year now. And this week that question may have an answer. WJCL learned deputies in Lowndes County received an anonymous email. Because those mentioned in the email are minors, their names have been changed to Jane and Joe. Here's what the email says:

>> My best friend was at a party Saturday night with Jane, and she was upset about something that Joe had said to her. She said that about a little over a year ago, she had sexual intercourse with Kendrick Johnson while she was dating Joe. Joe found out and threatened KJ. KJ told Joe to meet him in the old gym after the third block and he would have his knife ready. Joe and Joe's friend met KJ and killed him. Joe has also been heard admitting to killing KJ more than once over the phone. His brother also got drunk at a party on the 4th of July and told many people that Joe killed KJ and that Joe's brother was tired of keeping it a secret.

24

> And my sources told me one of the boys in the email is the son of an FBI agent. His father originally told him not to talk to investigators, but is now forced to talk because of the subpoena.

First, the Court finds Defendants are not entitled to the wire service defense. Upon review of case law from courts in Florida and in other states, the wire service defense is available for news publishers, such as newspapers, publishers of periodicals, and news broadcasters. See Nelson v. Associated Press, Inc., 667 F. Supp. 1468, 1476 (S.D. Fla. 1987) (noting that the wire service defense is available to "media defendants," such as newspapers and news periodicals, which rely upon other reliable periodicals, newspapers, and wire service reports as their sources); Nix, 772 F. App'x at 813 (finding ESPN and USA Today prevail on their wire service defenses); Reed, 2023 WL 6292578, at *24 n.23 (noting the wire service defense is available when one news source republishes content that was originally published by another reputable news source). Defendants are not media defendants in the business of periodically publishing news reports. Therefore, they may not invoke the wire service defense.

Similarly, the fair report privilege belongs to news media. Larreal v. Telemundo of Fla., LLC, 489 F. Supp. 3d 1309, 1318–20 (S.D. Fla. 2020); Grayson v. No Labels, Inc., No. 20-cv-1824, 2021 WL 2869870, at *3 (M.D. Fla. Jan. 26, 2021) ("Defendants' argument stumbles at the first hurdle: there are no allegations that they are news media entities and/or journalists as required for the application of the privilege, and Defendants themselves do not argue as such. It is not patently obvious that Defendants are members of the news media industry, and Defendants do not attempt to define

who qualifies as a 'news media entity' or a 'journalist.'"). As in <u>Grayson</u>, Defendants here do not persuade the Court they are news media defendants entitled to the fair report privilege.

As to Defendants' argument that the statement is not "of and concerning" Rick and Branden, the Court disagrees. Statement 7 references both "Joe's" brother and FBI agent father. Accordingly, the Court denies the motion to dismiss the claims related to Statement 7.

> ### viii. Statement 8: Statements that at the time of Kendrick's death, the Decedent didn't "have beef with nobody else," was not "into it with nobody else," and that the Bells "were the only ones" with whom Kendrick had conflicts.

Plaintiffs allege the statement below is defamatory. (Dkt. 16 at ¶ 75(h)) Defendants argue this statement is nonactionable opinion and it is not "of and concerning" Rick. The transcript of the Film is as follows:

> Kendrick's father: When all this happened, Kendrick didn't have no beef with nobody else. Kendrick wasn't into it with nobody else. They were the only ones.

The Court finds this statement is a mixed expression of opinion because it implies it is based on facts unknown to the Film's audience. Therefore, this statement would be actionable if it implied that the opinion was based on undisclosed defamatory facts. <u>Turner</u>, 879 F.3d at 1262. But the Court finds the implicated, undisclosed facts supporting this opinion are not defamatory in nature. Kendrick's father implies he knows facts which support his conclusion that Kendrick only had conflict with Brian and Brendan. The implied, alleged fact that Kendrick got along with everyone other

than Brian and Brendan, or that Brian and Brendan were difficult to get along with, are not defamatory in nature. A statement that high school students do not get along with each other is not actionable as damaging to any reputations.

ix. **Statement 9: A statement that after Kendrick's death, the Bells were "the only ones that didn't get interviewed" and "didn't get questioned," and were "the only ones at the time who lawyered up".**

Plaintiffs allege the statement below is defamatory. (Dkt. 16 at ¶ 75(i)) Defendants argue these statements are not defamatory in nature and are not "of and concerning" Rick. The transcript of the Film is as follows:

> Kendrick's father: They are the only ones, uh, didn't get interviewed. Uh, didn't, didn't want to get questioned. They were the only one at the time lawyered up.

These statements are not defamatory in nature. See Nunes v. Lizza, 486 F. Supp. 3d 1267, 1291 (N.D. Iowa 2020) (holding that a statement that the plaintiff intended to hire a lawyer was not defamatory because "[t]here is nothing defamatory about hiring a lawyer to defend against false claims or accusations" and "[t]he hiring of a lawyer is not an admission of guilt"). Thus, these statements are not actionable.

x. **Statement 10: Statements that the "coverup" of Kendrick's death began with "one of their own GBI agents and his children," "trickled down to the medical examiner" and the funeral home, and all the individuals involved were going to great lengths "just to cover for these children".**

27

Plaintiffs allege the statement below is defamatory. (Dkt. 16 at ¶ 75(j)) Defendants argue the statement is protected opinion based on the disclosed facts concerning the investigation's irregularities. The transcript of the Film is as follows:

> Kendrick's aunt: The cover up started with one of their own GBI agents and his children. And when it when they found out it was him, the coverup started there and then it trickled on down to the medical examiner, then on over to the funeral home. All that just it, it was just all this just going on and I'm like but y'all will go through all this just to cover for these children?

The assertion that there was a cover-up and that it began with a GBI agent is a statement concerning Rick,[2] and it is capable of being proven false. For this reason, the Court finds that the statement is not protected opinion. Accordingly, the motion to dismiss is denied as to Rick's defamation claim based on Statement 10.

### xi. Statement 11: A rhetorical question by a producer that indicated seven judges would not have recused themselves if "an FBI agent's children" had not been responsible for the Decedent's death.

Plaintiffs allege the statements below are defamatory, calling them a "rhetorical question by a producer off-screen that indicated seven judges would not have recused themselves if 'an FBI agent's children' had not been responsible for the Decedent's death." (Dkt. 16 at ¶ 75(k)) First, Defendants argue a rhetorical question cannot be defamatory. Additionally, Defendants argue the statement is pure opinion based on the disclosed fact that Brian and Brendan's father was an FBI agent, and the statement

---

[2] The Court assumes Kendrick's aunt misspoke, and meant to refer to Rick, an FBI agent and not a GBI (Georgia Bureau of Investigations) agent, with her statement.

is "of and concerning" the propriety of the judges' recusal, not the Bells. The transcript of the Film is as follows:

> Kendrick's mother: This town feels like they really run the world. Seven judges recuse themselves. How? Seven. How, when this is your job? I don't care cause that's your friend.
> Director: If it wasn't an FBI agent's kids, would seven judges have recused themselves?
> Kendrick's mother: Right. Would Michael Moore have gave up his position?

The Court finds this question implies a statement: if an FBI agent's children were not the persons of interest in the investigation, then seven judges would not have recused themselves. The Court determines this implicit statement, standing alone, does not satisfy the elements of defamation. For instance, the statement does not plainly accuse any of the Plaintiffs of any wrongdoing; rather, the statement refers to actions taken by the judges. Accordingly, the statement is not actionable as defamation as against Plaintiffs. The motion to dismiss is due to be granted as to Statement 11.

Notably, however, the implicit statement may be actionable when considered in context with the rest of the film. The Court considers this possibility in its determination of Plaintiffs' defamation by implication claims.

### xii. Statement 12: A statement that seeing Kendrick's "alleged killer," Brian, "standing next to him in the hallway the day he died in school has sent chills down our spines."

Plaintiffs allege the statements below are defamatory, calling them "a statement by the narrator, referring to Brian, that 'seeing the alleged killer of KJ standing next to him in the hallway the day he died in school has sent chills down our spines.'" (Dkt.

16 at ¶ 75(l)) Defendants argue the Film's reference to Brian as the "alleged killer" is opinion and incapable of being proven false. Next, Defendants argue the statement that the image "sent chills down our spines" is hyperbolic, protected opinion. Finally, Defendants argue the statement is not "of and concerning" Rick or Branden.

> News anchor: Did you see Kendrick that day?
> Brian: No. I did not.
> Narrator: Seeing the alleged killer of KJ standing next to him in the hallway the day he died in school has sent chills down our spines. How did no one see this frame? How did the FBI let this go? Why did it take six years and an independent filmmaker to find this? These are all questions that may never go answered. But what we do know for sure is that we have more facts now than we ever had and this case needs to be re-opened and re-examined with a fine-tooth comb.

The Film's reference to Brian as the "alleged killer" is a statement of fact: at least one person has alleged Brian is Kendrick's killer. However, the statement is an accurate characterization and therefore not defamatory. Accordingly, the motion to dismiss is granted as to Brian's defamation claim based on the "alleged killer" portion of Statement 12.

As for the statement that the image of Kendrick and Brian in the same hallway on the day of Kendrick's death "sent chills down [the filmmakers'] spines," the statement is one of pure opinion; it is a rhetorical statement about the filmmakers' impressions. The statement cannot be proven true or false. Additionally, the statement of opinion is not defamatory as to Plaintiffs. Assuming the statements underlying the opinion are false, as Plaintiffs allege, those false statements call into question the FBI's investigative methods and the transparency of the investigation. They are not

30

defamatory as to Plaintiffs. Therefore, this portion of Statement 12 is not actionable as

defamation, and the motion to dismiss is granted as to Statement 12.

> **xiii. Statement 13: A statement that individuals attempting to come forward with the truth were "going to jail" and "being threatened".**

Plaintiffs allege the statements below are defamatory, calling them a "statement

by the Decedent's aunt that individuals attempting to come forward with the truth

were 'going to jail' and 'being threatened.'" (Dkt. 16 at ¶ 76(a)) Defendants argue these

general statements about the overall direction of the investigation are protected

opinion. Defendants also argue the statements are not "of and concerning" the Bells.

> Kendrick's aunt: It's been several people that has come forth with the truth. But then you got them going to jail, being locked up being silenced if you say anything, being threatened.
> News report: A supposed lead in the Kendrick Johnson investigation has fizzled.
> Unidentified Interviewee: We identified the source of the email yesterday. Uh, we went and interviewed that person last night and what we found was, uh, they admitted they had sent the email, but they did it, did it out of a genuine interest in the case. Um, that this is information they had heard, nothing first-hand. Um, all rumors and speculation.
> Kendrick's mother: And other the [indistinct] guy, he was telling people about what happened to Kendrick and they found out and they got him in and kept him for so many months, nobody could get him out. And then when he got out he recanted his, the whole story. He said he wasn't telling the truth.

The Court finds these statements are "of and concerning" Rick, Branden, or Brian.

The test is whether the average person could reasonably conclude the statement

implicates the plaintiff upon reading the statement. Mac Isaac, 557 F. Supp. 3d at

1259. Although a statement may be "of and concerning" a person even if the statement does not name the person specifically, "if a defamed person is not named in the defamatory publication, 'the communication as a whole [must] contain . . . sufficient facts or references from which the injured person may be determined[.]'" Id. at 1258 (citations omitted). "A tortfeasor [can] juxtapose a series of facts in such a way that a specific person is identifiable even though that person's name has not been used." Zimmerman, 521 F. Supp. 3d at 1213. Here, although these statements do not expressly implicate Rick, Branden, or Brian by name, the statements are immediately followed by this statement by the narrator:

> When it comes to justice in this county, it's more about who you know. In this case, you have Lowndes County High School, the Superintendent's Office, the GBI, the FBI, and the DOJ.

Then, a statement from Kendrick's aunt:

> The cover up started with one of their own GBI agents and his children. And when it when they found out it was him, the coverup started there and then it trickled on down to the medical examiner, then on over to the funeral home. All that just it, it was just all this just going on and I'm like but y'all will go through all this just to cover for these children?

When informed by the statements immediately following, Statement 13 contains sufficient facts and references for the recipient audience to determine the statement defames Rick, who the statement accuses of intimidating witnesses into silence. Statement 13 is actionable as to Rick, and the motion to dismiss is denied as to Statement 13.

xiv. **Statement 14: A statement that Michael Moore, the attorney who oversaw the investigation of Kendrick's death, was "scared" out of his job by the Bells.**

Plaintiffs allege the statements below are defamatory, calling them a "statement by the Decedent's mother that Michael Moore, the attorney who oversaw the investigation of the Decedent's death was 'scared' out of his job by the Bells." (Dkt. 16 at ¶ 76(b)) Defendants argue the statements are protected opinion and are not "of and concerning" the Bells.

> Kendrick's mother: Michael Moore, I don't know. I know he ran scared like these people here scared him out of his job. I know that. Because how do you come out and say you're gonna take this case and look at it at every angle. But soon as it get hot, soon as you getting threats, you go run and take cover.

The Court finds these statements are mixed expressions of opinion as to why Michael Moore resigned from his position. Whether Moore resigned because he was "scared" is not readily capable of being proven false. The statements, however, imply they are based on undisclosed facts. Kendrick's mother's assertion she knows Moore was scared implies her opinion is based on more than her own belief or impression as to why he resigned. Therefore, these statements are actionable as defamation if they are "of and concerning" Plaintiffs and the facts underlying the opinion are false or inaccurately represented.

Statement 14 immediately follows the statements discussed in the Court's analysis of Statement 13, supra. Thus, when considered in the context of the Film, Statement 14 contains sufficient facts and references for an average person hearing the

33

statement to conclude it implicates Rick. Therefore, the motion is denied as to Statement 14.

### xv. Statement 15: A statement that Rick met with, followed, and intimidated witnesses in the case and "interfere[d] with a grand jury investigation".

Plaintiffs allege the statements below are defamatory, calling them a "statement by Mitch Credle that Rick met with, followed, and intimidated witnesses in the case and 'interfere[d] with a grand jury investigation.'" (Dkt. 16 at ¶ 76(c)) Defendants argue the statements are Mitch Credle's opinion that "if [Rick] was talking to witnesses, such action would be 'interfering' with the grand jury[.]" (Dkt. 29 at 25) Furthermore, Defendants argue Credle merely relays opinions of witnesses he interviewed who said they were not directly threatened, but instead "just felt that way" and "felt as though they were being followed." Defendants contend these relayed witness statements are not facts capable of being proven false.

> Credle: When it was clear to us that if we couldn't make the case as far as what happened to Kendrick because of all this missing evidence, missing body parts, all the witnesses. I mean just all…when we realized it was gonna be difficult to make the case, we start concentrating on obstruction. So, we started looking at the Bell's father, who's an FBI agent, for some of the things that he was doing. Every time we would talk to someone, a witness, they would tell us how Bell father met with them. And we were like, you can't interfere with a grand jury investigation, you have to leave it alone. But for some, somehow he kept meeting with the witnesses who we were trying to talk to. And we finally talked to the witness. We found out that they done talk to, to the Bell, the Bell father. They said they were not threatened directly, they just felt that way. They're always, they felt as though some say they always felt as though they were being followed. I even remember

34

> interviewing a young lady who told us how Rick Bell would
> visit her, her job or she would see him outside of her job and
> that used to make her nervous. And I felt as though we were
> very close to getting enough information, whereas we can
> say he committed obstruction. An FBI agent committed
> obstruction of justice. The morning we um, we did the raids,
> plenty of agencies were involved and we went to a lot of
> different locations.

The Court finds the several of these statements are ones of fact, not opinion. Whether

Rick spoke to witnesses, and whether the witnesses told Credle they felt they were

threatened indirectly or were being followed, are statements of fact readily capable of

being proven false. Therefore, the statements are not protected opinion.

Additionally, Credle states his opinion that these actions constituted obstruction

of justice. He states he and his colleagues began to focus on making out a case for

obstruction and told Rick not to "interfere with a grand jury investigation." Credle

concludes, "I felt as though we were very close to getting enough information, whereas

we can say he committed obstruction. An FBI agent committed obstruction of justice."

These statements are pure opinion because they are based the disclosed, alleged fact

that Rick spoke with witnesses to the investigation. These statements are actionable if

the facts underlying the opinion are false or inaccurately represented, which Plaintiffs

allege is the case. Accordingly, the motion to dismiss is denied as to Rick's defamation

claim based on these portions of Statement 15.

> xvi. **Statement 16: A statement former investigators in the case
> "thought they got to the point where either [they] were going to
> make an arrest of [Rick], or he may have been getting indicted".**

35

Plaintiffs allege the statements below are defamatory. (Dkt. 16 at ¶ 76(d)) Defendants argue the statement is protected opinion based on Credle's observations during the investigations and facts disclosed in the Film.

> Credle: We got to the point where we really thought either we're gonna make an arrest of him or he may have been getting indicted. But for us to get a notification that we were no longer going back to Georgia, I was like huh? That's impossible. No, you're not going back. You have work to do in D.C. I'm like, what work?

This statement is readily capable of being proven false. Credle states he and his colleagues were about to arrest or indict Rick but were called off. Therefore, the statement is actionable as defamation and the motion to dismiss is denied as to Statement 16.

### xvii. Statement 17: A statement that after the case was dismissed, Credle "really thought they must have struck a deal with Rick Bell".

Plaintiffs allege the statements below are defamatory. (Dkt. 16 at ¶ 76(e)) Defendants argue the statements opinions and are therefore incapable of being proven false.

> Credle: For us to not make an arrest, for me to find out later the case was dismissed, just my personal feeling, I felt as though something had to have occurred. And I really thought that they must have struck a deal with Rick Bell.

This statement is not readily capable of being proven false because it is Credle's opinion regarding the outcome of the investigation. Therefore, the statement is not actionable as defamation.

xviii.  **Statement 18: Statements that the Department of Justice had evidence of Rick's corruption, and that Rick was forced to resign from his job with the FBI.**

Plaintiffs allege the statements below are defamatory, calling them "Statements by the Decedent's father that the Department of Justice had evidence of Rick's corruption, which they were planning to turn over to the FBI, and that Rick was subsequently forced to resign from his job with the FBI." (Dkt. 16 at ¶ 76(f)) Defendants argue this statement is a privileged communication from an official government source.

> Kendrick's father: He lost his job because the DOJ had evidence of corruption. I say they actually told me that on the phone, we was on a phone conference. He said Mr. Johnson, we're gonna tell you, they are not gonna lock him up and they are not gonna fire him, but they're gonna make him resign. They said we got evidence of corruption of Rick Bell. And what we gonna do, we gonna turn it over to the FBI. And shortly after that he resigned.

As noted <u>supra</u>, the Court declines to hold that Defendants may invoke the fair report privilege. Accordingly, the motion to dismiss is denied as to Statement 18.

xix.  **Statement 19: A statement that if the investigation would have continued, Credle "felt as though" Rick would have been arrested for obstruction of justice.**

Plaintiffs allege the statements below are defamatory, calling them a "statement by Mitch Credle that if the investigation would have continued, he 'felt as though' Rick would have been arrested for obstruction of justice." (Dkt. 16 at ¶ 76(g)) Defendants argue this statement is Credle's opinion, therefore, it is not actionable.

37

> Credle: I felt as though if we would have continued our investigation, not only would we have made, um, an arrest with Bell for obstruction, I really believe we would have got to the bottom of what happened to Kendrick if Bell would have been charged with obstruction of justice. I'm looking at Kendrick's father, I'm looking at myself and I'm saying to myself, as I look at Kendrick's father, is that I'd probably be in jail for murder.

This statement is an opinion based on facts disclosed in the publication. Credle states Rick would have been arrested if the investigation would have continued. Therefore, the statement is actionable as defamation and the motion to dismiss is denied as to Statement 19.

In summary, the Court dismisses the Complaint as to Statements 1, 2, 3, 4, 5, 6, 8, 9, 11, 12, and 17. However, Defendants' motion to dismiss is denied as to Statements 7, 10, 13, 14, 15, 16, 18, and 19.

### c. Defamation by Implication Claims

Plaintiffs adequately plead their defamation by implication claims. Florida law recognizes that "literally true statements can be defamatory where they create a false impression," and thus permits recovery for the tort of defamation by implication. Jews for Jesus, 997 So. 2d at 1106. Whether statements constitute defamation by implication is a question of law for the court to determine. Turner, 879 F.3d at 1269. "A defamation by implication claim can arise in two instances: where a defendant (1) 'juxtaposes a series of facts so as to imply a defamatory connection between them' or (2) 'creates a defamatory implication by omitting facts . . . even though the particular facts are correct.'" Flynn v. Cable News Network, Inc., No: 22-cv-343, 2023 WL

5985193, at *6 (M.D. Fla. Feb. 22, 2023) (quoting <u>Jacoby v. Cable News Network,
Inc.</u>, No. 21-12030, 2021 WL 5858569, at *3 (11th Cir. Dec. 10, 2021)).

The Court finds Plaintiffs state a claim for defamation by implication against
Defendants. In support of the defamation by implication claims, Plaintiffs allege the
Film contains interviews of people who state that a fight between Brian and Kendrick
created ill will between them and this ill will led to Brian's involvement in Kendrick's
murder. (Dkt. 16 at ¶ 267) Also, Plaintiffs allege the Film contains an excerpt from a
news broadcast that addresses "an unsupported rumor that a conflict between"
Kendrick and Brian over Kendrick's "alleged involvement with Brian's girlfriend
provided another motive for Brian to murder" Kendrick. (<u>Id.</u> at ¶ 268) Plaintiffs further
allege the Film incorporates statements by various people "that express that Brian and
Branden suffered no consequences for their involvement in [Kendrick's] death because
their father was an FBI agent." (<u>Id.</u> at ¶ 269) Plaintiffs allege the Film presents
Kendrick's death as a murder with similarities to the murder of Emmett Till. (<u>Id.</u> at ¶
270) Plaintiffs allege the Film contains statements by Kendrick's friend that Brian
behaved suspiciously after Kendrick's death "due to Brian's involvement in it." (<u>Id.</u> at
¶ 271) Finally, Plaintiffs allege the Film features statements that indicate Rick
interfered with the investigation of Kendrick's death to cover up his sons' participation
in it. (<u>Id.</u> at ¶ 272)

In addition to the foregoing allegations, which Plaintiffs state specifically in
support of the defamation by implication claims, Plaintiffs also generally allege the
following. First, Defendants omit from the Film that post-mortem images of Kendrick

the Film displays were taken after an autopsy procedure that causes the body to appear deformed, as if from violence. (Id. at ¶ 36 n.1) Next, the Film omits evidence that Brian and Branden were not near Kendrick at the time of his death. See supra, at 4. Finally, the surveillance footage the Film portrays as a newly discovered "smoking gun" was not newly discovered. (Id. at ¶¶ 55, 56)

Taking all these allegations together, Plaintiffs allege plausibly Defendants juxtaposed a series of facts to imply a defamatory connection between them, or omitted facts to create a defamatory implication. Plaintiffs identify several facts that were juxtaposed and how their juxtaposition implied something defamatory. Similarly, Plaintiffs identify omitted material facts and show that an alleged false implication about Plaintiffs would be contradicted by those omitted facts.

Accordingly, the motion to dismiss is denied as to Counts V, VI, and VII.

### d. Negligence Claims

Defendants argue Plaintiffs' negligence claims must be dismissed because they violate the single publication rule under Florida law. "'In Florida, a single publication gives rise to a single course of action." Rubinson v. Rubinson, 474 F. Supp. 3d 1270, 1278 (S.D. Fla. 2020) (citations omitted). Accordingly, to be properly plead, a claim for negligence may not be based on the same facts alleged to support a claim of defamation. See id.; Klayman, 22 F. Supp. 3d at 1256–57 (quoting Fridovich v. Fridovich, 598 So. 2d 65, 70 (Fla. 1992)) ("Recovery for separate causes of action is proper when they 'are properly pled upon the existence of independent facts.'"); Five for Ent. S.A. v. Rodriguez, 877 F. Supp. 2d 1321, 1326 n.1 (S.D. Fla. 2012) ("Other

40

torts that arise from the allegedly false and defamatory material must be considered as part of the same claim[.]").

Here, Plaintiffs' negligence claims are based on the same facts as the defamation claims. For example, Plaintiffs allege Defendants failed to exercise due care to verify facts related to Kendrick's death and to convey such facts in a way that does not misrepresent the Bell's involvement, "thereby defaming them." (Dkt. 16 at ¶ 365) Plaintiffs state, "It is reasonably foreseeable that misrepresentations in publishing that falsely impute criminal conduct to individuals could reasonably result in . . . reputational damage and humiliation[.]" (Id. at ¶ 367) Plaintiffs' negligence claims are merely reiterations of Plaintiffs' defamation claims. Thus, under the single action rule, the negligence claims must be dismissed. The motion to dismiss is granted as to Counts IX, X, and XI.

## IV.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendants' Motion to Dismiss, (Dkt. 29), is **GRANTED IN PART and DENIED IN PART**.

   a. The Motion is **DENIED** as to Counts I, II, and III. Plaintiffs' defamation claims based on Statements 7, 10, 13, 14, 15, 16, 18, and 19 survive Defendants' Motion to Dismiss.

   b. The Motion is **DENIED** as to Counts V, VI, and VII.

    c. The Motion is **GRANTED** as to Counts IX, X, and XI. These Counts are **DISMISSED**.

    d. Counts XIII, XIV, and XV are **DISMISSED** pursuant to the Parties' stipulation. (Dkt. 52 at 4) Counts IV, VIII, XII, and XVI are **DISMISSED WITHOUT PREJUDICE** pursuant to Plaintiffs' voluntary dismissal of Defendant Red Arrow Studios International, Inc. (Dkt. 55)

2. The Clerk is directed to **LIFT THE STAY**.

3. Defendants shall file an answer to the Amended Complaint within twenty-one (21) days of the date of this Order.

    **DONE** and **ORDERED** in Tampa, Florida this 17th day of April 2025.

**Copies furnished to:**
Counsel of Record
Any Unrepresented Party

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE